OPINION OF THE COURT
Marcy L. Kahn, J.
*854 Background
On September 13, 1999, defendant entered guilty pleas to class C felonies in each of the two above-referenced actions in which he had been charged with criminal sale of a controlled substance in the third degree. Pursuant to his plea agreement, defendant was promised, as a second felony offender, concurrent terms of incarceration of three to six years in each case. In February 2000, defendant, through his counsel, advised the Judge before whom he had .entered the plea that he was and had been for several years suffering from AIDS, and that his treating physician had opined that a prison sentence of three to six years would cause defendant’s death. The court postponed sentence and ordered a hearing on the question of the effect that the contemplated prison sentence would have on defendant’s health. On June 29, 2000, the matter was referred to this court for all purposes.[2]
This court then conducted a hearing on the issue of whether incarceration would be likely to cause defendant’s death. (People v Browarnik, 42 AD2d 953 [1st Dept 1973].) At the conclusion of the hearing, the defendant moved for a modification of his sentence agreement. For the reasons stated herein, the motion is denied.
The Hearing Evidence
At the hearing held on June 29 and July 14, 2000, the defendant called Conrad Fischer, M.D., his treating physician for the past four years. Dr. Fischer received his M.D. degree in 1988 from Albany Medical College, did his residency and served as Chief Resident in Internal Medicine at St. Luke’s-Roosevelt Hospital, and eventually became Director of the Internal Medicine Residency at St. Clare’s Hospital in Manhattan. He is currently Director of Internal Medicine at Maimonides Medical Center in Brooklyn and serves on the faculty of New York University School of Medicine and the State University of New York at Downstate Medical School. He is board certified in both internal medicine and infectious diseases. Over the course *855 of the past 12 years, he estimates that he has treated approximately 3,000 patients with HIV disease.[3]
I found Dr. Fischer’s testimony regarding the defendant’s medical condition and treatment to be highly credible. Nonetheless, I believe his testimony to have been essentially motivated by a desire, albeit well intentioned, to aid his patient. To the extent that this motivation caused him at times to rely on unsupported generalizations, speculation and factual inaccuracies in his testimony regarding the medical care policies and practices currently in use in the State prison system, I decline to credit it.
The People did not challenge defendant’s evidence on the subject of defendant’s medical condition or treatment. Their sole witness was Alexis Lang, M.D., who works for the New York State Department of Correctional Services (DOCS) as Regional Medical Director for the Downstate Region. Dr. Lang is a 1981 graduate of the University of Missouri Medical School. After completing her residency at the University of New Jersey and spending several years in private practice, she joined the DOCS medical staff in 1984, providing direct medical services to inmates. Dr. Lang is currently one of five Regional Medical Directors for DOCS, and as such oversees health services at 14 correctional facilities in the southern quarter of the State, including both male and female reception centers. Her responsibilities include recruiting, training personnel, coordinating services and making site visits.[4]1 found her testimony regarding DOCS’ policies and procedures to be credible and supported by the other evidence in the record.
The People submitted several items of documentary evidence, including a graph depicting AIDS-related mortality rates: 1981-1999, excerpted from the DOCS Division of Health Services 1999 Report; the DOCS HIV Primary Care Practice Guideline (Practice Guideline or Guideline); HEPP News (May 1999: Brown Univ. School of Medicine Off. of Continuing Med. Educ.; Brown Univ. AIDS Program); the DOCS Division of Health Services 1999 Report; L. Miller and R. Hayes, Literature Review: Adherence to Combination Antiretroviral Therapy: Synthesis of the Literature and Clinical Implications, AIDS Reader, 2000; 10 (3); 177-185 (AIDS Reader Literature Review); *856 and DOCS Health Services Policy Manual Item No. 7.2 (June 14, 1991).
The court also received as defendant’s exhibit 1 in evidence a letter dated July 31, 2000 from Dr. Fischer, submitted by defendant in response to Dr. Lang’s testimony. The defendant also submitted an article from the July 2000 Correctional Association Bulletin reporting on a study done by the Correctional Association of New York, entitled Health Care in New York State Prisons, and both the article and the study (Correctional Association Report or Report) have been deemed incorporated into the record as defendant’s exhibits 2A and 2B, respectively. Based upon the credible evidence adduced, I make the following findings of fact.
Findings of Fact
I. Defendant’s Medical Condition and Treatment Needs
Dr. Fischer began treating the defendant for AIDS-related conditions in 1996. Defendant initially presented with a T-cell count of two, and Dr. Fischer considered him to have a profoundly deteriorated immune system. He commenced treatment of defendant with various combinations of antiretroviral medications (ART) designed for the treatment of HIV disease.
At the time the treatment commenced, Dr. Fischer estimated defendant’s life expectancy to have been between three and six months. Defendant has responded well to the medication regimen designed for him by Dr. Fischer, however, and at this point, assuming that his treatment continues, Fischer estimates his life expectancy to be several more years. Defendant currently takes five antiretroviral drugs, viz., Epivir (lamivudine or 3TC), Zerit (stavudine or d4T), Ziagen (abacavir or ABC), Sustiva (efavirenz), and Viracept (nelfinavir mesylate), as well as Bactrim, an antibacterial agent. The frequency of administration of the ART drugs ranges from two to three times per day, depending upon his condition. Dr. Fischer monitors defendant’s condition by personally examining him at intervals from once every few weeks to every two to three months, depending upon his status. On these occasions Fisher performs blood tests to check defendant’s T-cell count and viral load and monitors any side effects defendant is experiencing from his medications.
Dr. Fischer initially opined that without adherence to this medication regimen the defendant’s life expectancy would be somewhere between one and two years. Dr. Fischer also *857 indicated that any repeated interruptions in defendant’s drug therapy, even of very short duration, e.g., missing one dose each week for several weeks, would put him at risk for developing a resistant strain of the virus. Missing a single treatment, however, would not put the defendant in jeopardy.
Dr. Fischer characterized defendant’s condition as unusual compared with that of other HIV patients. At present, defendant has a T-cell count of 182 and his condition is more fragile than any of Fischer’s other patients, due to his having been exposed to at least 10 separate AIDS-related medications. Defendant is also much more susceptible to developing infections from interruptions in treatment, due to his having developed a partially resistant virus during the course of his medication trials over the preceding four years. Because his current treatment regimen involves five separate AIDS medications, Fischer stated, defendant’s virus is also more sensitive to alterations in therapy.
Dr. Fischer acknowledged that although defendant’s T-cell count had not rebounded to as high a level as that reached by others of his patients with AIDS, at this time he has limited symptoms from his HIV condition, is doing well on his medication, and reported feeling well on many of Fischer’s examinations of him over the past two and one-half years. Fischer acknowledged that as recently as March of this year, defendant gave the appearance of “near normalcy.”
Dr. Fischer characterized defendant’s current drug regimen as his last chance to succeed with antiretroviral therapy. If he were to fail with this regimen, there is currently no acceptable medical alternative. On the other hand, Fischer acknowledged that new drugs are being developed for HIV on a continuing basis.
II. The DOCS Correctional Health System
The New York State prison system is the third largest in the country, providing health care services to its 71,000 inmates lodged in 70 correctional facilities throughout the State. In 1998, its medical staff treated more than one million patients. Primary medical care is provided to DOCS inmates by some 1,500 DOCS medical staff employees, while specialty care is offered through outside contracting agencies. HIV/AIDS services are provided by DOCS personnel, by the Department of Health (DOH) AIDS Institute and by specialty service providers under contract to DOCS or DOH.
According to the Federal Bureau of Justice, as of 1996, DOCS was responsible for 8,700, or 35% of the Nation’s HIV-infected *858 prison inmates. By the close of 1999, DOCS estimated the number of HIV-positive inmates in its custody to be approximately 7,000. Although 80% of DOCS inmates are from the New York City area, most are lodged in facilities upstate and distant from their community health care providers. DOCS makes approximately 170,000 inmate transfers between its various facilities each year.
Every correctional facility in the State has a medical unit overseen by a licensed physician who reports to one of the five regional medical directors. Various speciality services are also provided at certain locations. Upon entry into the system, each inmate is evaluated at the reception center to determine a medical level need, any mental health needs, and a security classification assessment. This assessment occurs during the approximate seven-day period that inmates spend in the reception area. During that time, the prisoner is physically assessed, medication is provided as needed and, in the event that the inmate is experiencing a medical emergency, he or she can be placed on a medical hold at the reception center until the condition is stabilized. Each reception center has a pharmacy on site, as well as access to an outside pharmacy in the event the prisoner’s medications are not immediately available at the facility. Medications can usually be obtained from the outside pharmacy within 24 hours. Once the inmate leaves the reception center and arrives at the assigned facility, he or she receives a second medical evaluation.
DOCS classifies prisoners’ medical needs according to the three levels of care provided in its facilities. Level one facilities have a 24-hour medical doctor on site or on call, as well as 24-hour nursing staff and an on-site infirmary available for the inmates. Level two facilities have a 24-hour physician on site or on call and, although lacking an on-site infirmary, have nursing staff available 16 hours each day. Level three facilities, typically serving inmates on temporary release, provide a medical doctor on site or on call during limited hours and provide nursing care for 40 hours per week.
Inmates who present with HIV disease are first evaluated and tested for CD-4 and viral load levels. Depending upon their condition, they are typically referred to a level one facility to assure frequent monitoring of their condition and access to necessary services, even if they are asymptomatic, until it is determined that their condition can be appropriately monitored at a level two facility. Thus, until it is established that the inmate’s viral load and CD-4 count are being adequately *859 maintained, the inmate generally will be assigned to a level one facility. DOCS does, however, adequately maintain some inmates who have HIV disease in level three facilities during their assignment hr work release.
Every region has a contract with an outside vendor to provide infectious disease and other specialized services. All DOCS contracts require establishment of designated AIDS Treatment Centers, enabling inmates to consult with HIV specialists regardless of the correctional facility to which they are assigned. Infectious disease specialists are thereby able to assess the HIV-positive inmates upon their entry into the system to fix an appropriate regular consultation schedule. Furthermore, HIV clinics are now accessible to inmates either within their DOCS facility or at hospitals proximate to the prisons. This has resulted in increased service provision for inmates who require HIV care. Of the 14 downstate facilities overseen by Dr. Lang, the only male facilities without either an HIV clinic on-site or access to a hub serving facilities within 20 minutes’ travel time are work release facilities.
In addition, through telemedicine, the medical staff at DOCS facilities have increased access to specialty care services provided by the outside contracting hospitals. DOCS also uses telemedicine to enable their speciality physicians assigned to one facility to assess inmates located at another facility without the necessity of physically transporting the patient. As of December 31, 1999, DOCS had installed telemedicine video conferencing equipment in 39 of its health units throughout the State, linking them with contracting hospitals.
The authors of the Correctional Association Report found that during the period of its study (1997-1999), only two of the 22 prisons visited tracked inmates’ compliance with their HIV antiviral therapy regimens systematically. However, Dr. Lang testified that HIV care for DOCS inmates is now monitored by DOCS regional staff using specialized flow sheets derived from the Practice Guideline discussed below. DOCS pharmacists are also trained to notify care providers of any apparently inappropriate therapy prescribed for HIV-positive inmates.
During 1999 DOCS worked with pharmaceutical company representatives to develop a series of educational videos on patient adherence to ART, incorporating the participation of former inmates and stressing the importance of maintaining one’s medical regimen. Inmates and staff are also provided annual education and training in avoiding blood-borne infections. In addition, DOCS works with community-based organizations *860 to offer HIV-positive inmates transitional planning so that they will be afforded a continuing source for health care services after their release from prison.
In-service training of DOCS medical personnel is done in conjunction with Albany Medical Center using satellite broadcasts to assure that DOCS staff charged with management of HIV are aware of current developments regarding antiretroviral medication and its medical complications. These training broadcasts began several years ago and have now been broadcast to more than two dozen other States via satellite. Additionally, DOCS holds monthly conferences presented by its specialty care vendor addressing chronic disease issues.
Based upon a recent review of the medical and scientific literature on adherence to combination antiretroviral therapy in the AIDS Reader Literature Review, the greater the adherence of the patient to the treatment regimen, the greater the suppression of the HIV virus. According to the literature reviewed in the article, the goal for effective suppression of the virus is 95% compliance. At least one study reviewed showed that a drug-resistant strain of HIV emerged in test subjects who reported missing at least 7% or more of their medication administrations during the course of a year-long study. According to Dr. Fischer, a patient receiving a combination of antiviral AIDS therapy can miss no more than 5% of doses without developing a resistant virus.
Cognizant of the findings reported in the AIDS Reader Literature Review and working in consultation with Albany Medical Center, DOCS has developed clinical standards for diagnosis and treatment of inmates with HIV disease as embodied in the Practice Guideline. Personnel at all of the DOCS facilities are given regular updates on the Guideline and its protocols, and their training includes information on how to comply with Guideline requirements. The Practice Guideline sets forth recommended procedures for the use of antiretroviral therapy for persons infected with HIV and is based in part on information received from the Panel on Clinical Practices for the Treatment of HIV Infection convened by the United States Department of Health and Human Services, as well as upon information obtained from the National Institutes of Health. The Practice Guideline sets forth basic principles underlying ART, explaining that viral load testing of plasma HIV RNA level reflects the rate of disease progression, while CD-4 cell testing shows the extent of the progression of the disease. The Guideline advises that treatment decisions *861 should be individualized and based upon measurements of both the viral load and CD-4 count with the goal of therapy being the “maximum achievable suppression of HIV replication, preferably to undetectable levels on ultra-sensitive plasma HIV RNA assays” (People’s exhibit 2, at 2). The Guideline explains that the most effective means to suppress HIV is through the simultaneous administration of combinations of antiretroviral drugs with which the patient has not previously been treated and which are not cross-resistant with antiretroviral agents used previously to treat the patient. The Guideline specifically provides:
“ART should be given in optimum schedules and dosages.
“Any change in ART decreases the remaining pool of effective antiretroviral drugs.” (People’s exhibit 2, at 2.)
The Guideline further prescribes that ART should be offered when an individual’s CD-4 T-cell count is below 500 cells per milliliter. It also provides that, as a general matter, testing for viral load and CD-4 count should be done with as great a degree of consistency as possible. In conformity with this requirement, inmates are initially tested for viral load and CD-4 at the reception center and, if they are asymptomatic, the tests will be repeated every three months thereafter. If symptoms appear, testing is done more frequently. Dr. Lang noted that the Guideline established a minimum requirement for testing. Initial monitoring of an inmate’s CD-4 count and viral load would initially be done at four-week intervals, and, depending upon the response to the medications, at two-to-three-month intervals thereafter.
Additionally, the Guideline informs providers that “Continuity of treatment and adherence to ART regimens is critical to success. Lapses in compliance can lead to treatment failures * * * and drug resistance.” (People’s exhibit 2, at 4.) The Guideline also suggests that patients on ART should be closely monitored and their adherence to the treatment regimen should be insured, if necessary, by directly observed administration of the medications, if patient compliance is in doubt. The Guideline also explains that, while little is presently known concerning what constitutes a clinically significant interruption of ART, it is known that inadequate drug therapy (e.g., provision of some, but not all, of the drugs used in the ART) produces drug-resistant strains of HIV. The Guideline then discusses criteria for changing a patient’s ART regimen and *862 provides objective clinical criteria as signposts for the consideration of a change in therapy. The Guideline explains that, due to the limited number of drugs available and approved for use in ART, it is often difficult to develop a new combination ART regimen which will be equally effective in attacking the virus. The Guideline notes that, upon recommendation of the infectious disease or HIV consultant or upon discussion with the regional medical director, a genotypic resistance assay to determine the patient’s resistance pattern may be ordered for patients currently on ART. The Guideline also lists treatment options when changing ART, including precautions for avoiding cross-resistance. The Guideline also sets forth record-keeping standards for inmates with HIV disease.
The Guideline also contains standards for listing indications for initiation of ART, as well as a list of antiretroviral agents used by DOCS facilities to treat established HIV infection. This list includes all five of the medications currently being used to treat defendant, and all five are currently available at DOCS facilities. The Guideline also makes recommendations for the indications necessary to initiate a change in therapy, consisting of drug intolerance or treatment failure as evidenced by certain objective clinical signs. This portion of the Guideline suggests that an HIV specialist be consulted when the patient’s CD-4 count is below 300 cells. All of the approved antiretroviral therapeutic agents are listed along with their dosages, adverse effects and drug interactions. DOCS policies respecting treatment for HIV, including ART, are subject to change when new drugs become available and the standard of treatment in the community at large changes. Recognizing that barriers to service delivery continue to exist within the correctional setting, however, DOCS maintains an ongoing working relationship with the AIDS Institute to develop and revise its clinical treatment protocols and assure that its Practice Guideline conforms to national standards.
While the number of AIDS cases among DOCS inmates has remained relatively constant since 1992 at approximately 10% of the New York State prison population, the AIDS mortality rate among DOCS inmates has decreased dramatically during the same time period, from 40 deaths per 10,000 population in 1991 to 3.65 deaths per 10,000 population in 1999. Only 13% of all inmate deaths in 1999 were attributable to AIDS-related causes, bringing the mortality rate due to AIDS within DOCS to its lowest level since 1983. This significant improvement in the AIDS mortality rate is consistent with, but more favorable *863 than, the reduction of AIDS-related deaths in the general population. The reduced mortality rate has been characterized as reflecting the advent of newly developed antiretroviral medications for persons within and without the DOCS system, as well as general improvements in the standard of care provided by DOCS, working in collaboration with the Department of Health New York AIDS Institute to increase the availability of HIV testing and counseling for inmates and enhance educational programs for both inmates and staff. In addition, during the period from 1995 to 1999, the portion of the DOCS budget attributable to HIV/AIDS increased 66%, while the over-all DOCS budget rose only 15%. Further, in 1999, DOCS pharmacies provided $36.8 million worth of medications to DOCS inmates. Of this amount, more than $22.4 million was attributable to AIDS medication. At present, an estimated 2,800 DOCS inmates are receiving ART.
III. DOCS’ Ability to Provide Adequate Treatment to Defendant
Dr. Fischer opined that the level of care given to patients with HIV disease within the New York State Department of Correctional Services prison system fails to meet national standards. Fischer contended that he was not merely expressing bis own opinion but rather a “consensus statement” of unidentified persons that the level of care within the State prison system was below national standards.
Fischer maintained that the medical treatment defendant would receive in the State correctional system would be inferior to the care he is currently receiving in the community owing to interruptions and alterations in treatment, a failure to use the most recently available medications and poor follow-up on tests and treatments. He also felt that the correctional system relied too heavily on nonphysicians for the delivery of care and had limited access to infectious disease specialists to provide appropriate care.
Dr. Fischer further offered his opinion that, were the defendant to be sent to prison, he would die. Fischer testified that the risk to defendant of progression of his disease and death is directly proportional to the frequency of the alterations of his medical regimens. According to Fischer, defendant’s therapy would be altered in prison and interrupted “at every point within the prison house system” (transcript, at 23), resulting in his death within 6 to 12 months.
His credibility on this point was significantly undermined in a number of respects, however. Initially, Fischer stated that he *864 based his opinion on his service at St. Clare’s Hospital from 1990 through 1993 as physician in charge of a 24-bed inpatient unit serving State prison inmates who required hospitalization outside of the medical facilities within the prison system. Fischer’s views were further informed by his experience treating prison inmates at Bellevue Hospital during his service there from 1997 to 1999. However, he was unaware whether those inmates were from the State or New York City correctional systems. Fischer also had never visited any of the prison medical facilities run by DOCS. When asked to describe the medical facilities and level of care currently afforded by the New York State prison system, the witness initially became evasive and ultimately admitted a lack of familiarity with the levels of care being given at the State prison facilities at the present time. He ultimately opined that the care was inadequate due to its provision under contract by St. Barnabas Hospital, which has been the subject of considerable public criticism.[5] However, St. Barnabas has been a contractor with the New York City Department of Correction, not with the New York State Department of Correctional Services, and its record is not germane to this motion.
As counsel pressed Dr. Fischer further to describe the facilities available for health care services within DOCS, the witness confidently asserted knowledge of inadequate staffing by specialists and medical doctors, but exhibited hostility to the questioner and recalcitrance in answering the questions, repeatedly asking for definitions of commonly defined terms such as “number,” “within,” and “describe.” He acknowledged that he was unaware of the number of infectious disease specialists working within the New York State prison system and lacked familiarity with the treatment protocols within the DOCS health care system for HIV patients. When pressed for details underlying his conclusion that defendant would not have access to his current treatment regimens, the doctor admitted that he had “no way of stating” which drugs the defendant would not be able to obtain within the prison system. Dr. Fischer acknowledged that the dramatic reduction in the *865 AIDS-related mortality rate in the New York prison population since 1991 was significant, but declared that it would not change his view about whether the defendant could obtain adequate medical treatment in the New York prison system.[6]
Fischer estimated the likelihood that defendant would receive all of his required medications while in prison to be no more than 80%, although he admitted that his knowledge of the level of care was based upon information he had received from other undisclosed persons and from his own personal experience treating prison inmates in the past. Fischer put the likelihood of defendant’s treatment regimen being altered in prison at 100% although he offered no underlying rationale for that assessment.[7] Upon further inquiry, Fischer was unable to offer an opinion on defendant’s chance of surviving a prison sentence of three to six years but expressed the view that defendant would undergo a “grave risk” by having to serve such a sentence. Fischer’s view of the likelihood of harm resulting to defendant was based on his understanding that a patient receiving a combination of antiviral AIDS therapy can miss no more than 5% of doses of the medications without developing a resistant virus.
Commencing in 1997, the Correctional Association of New York, supported by grants from three New York-based private foundations, conducted an 18-month study of medical services provided to prisoners in the New York State prison system. Its team of researchers visited 22 prisons and interviewed 1,300 inmates as well as 100 members of the DOCS medical staff. The team’s findings indicated that medical care within the State prison system varied widely, due to the absence of a State-wide quality assurance program, and that DOCS physicians were underpaid and often inappropriately trained and/or poorly credentialed.
Nonetheless, the Report found that during the period of the study, DOCS providers were able to offer inmates with HIV the latest ART medications, although it concluded that the medical staff needed to do more to ensure that inmates learned about the side effects and proper dosages of the drugs. While commending DOCS for its role in having reduced the number *866 of AIDS-related deaths of State prison inmates by 85% during the period 1995-1998, the Report also cited anecdotal evidence that incorrect medications had been dispensed to HIV-positive inmates at two women’s prisons. The Report observed that collaboration between the inmate’s DOCS physician and his community-based specialist rarely occurred, that greater continuity of care was needed for chronically ill inmates, such as those with AIDS, in terms of a single doctor being responsible for tracking a patient’s condition and treatment, and that wide variations existed throughout the system in the level of clinical management of AIDS cases and in the provision of support services for prisoners with AIDS and HIV. In particular, the Report found that at the majority of the prisons examined during the study period prisoners’ adherence to ART was not systematically tracked by medical staff. The Report recommended increased training of DOCS medical staff in clinical management of AIDS, but concluded that the problems currently facing the prison health care system could not be solved without increased budget appropriations by the Legislature and Governor.
Dr. Lang acknowledged that continuity of care to HIV-positive inmates is challenged by the frequency and volume of inmate transfers between DOCS facilities. However, the 500 inmate transfers occurring daily within DOCS are now tracked by computer. When they are transferred between facilities, and at the time of their release, HIV-positive inmates take with them not only their personal property, but also their medical records and a supply of all prescribed medications. All are seen by medical staff within 24 hours of being transferred. In the event that the inmate does not have his or her antiretroviral medications on entering a new DOCS facility, however, the inmate would be able to obtain them immediately in the receiving facility or from outside pharmacies.
Two other DOCS policies also address the needs of acutely ill inmates. The first of these is the medical parole program established pursuant to Executive Law § 259-r, which allows a terminally ill or severely physically ill patient to seek early release on parole. A request for medical parole may be initiated by the patient and is ultimately determined by the Parole Board, based upon a review of the patient’s history and medical information, as well as security considerations. Of 84 .requests made for medical parole during 1999, 12 were granted.
The second program is the DOCS Division of Health Services policy for honoring an inmate’s request for a health care *867 provider of choice. Pursuant to this policy, an inmate may be granted a request in the discretion of DOCS Division of Health Services to receive treatment from his or her own physician while incarcerated. If the request is granted, the services will be provided within the correctional facility and the cost of the services will be borne by the inmate or a third party, rather than by DOCS. Dr. Lang acknowledged the difficulty of implementing this procedure in most cases, due to the fact that, upon entering DOCS’ custody, individuals lose their eligibility for Medicare and Medicaid reimbursement.
DOCS health care providers have managed the care of HIV-positive patients who had a T-cell count less than 10. In Dr. Lang’s view, a T-cell count of 182 would not be unusual among the DOCS population of HIV-positive inmates. She also opined that such a T-cell count would not present a grave risk of death to the inmate by having to serve a term of incarceration in the New York State prison system and under the care of DOCS providers. In this regard, she observed that most HIV-positive inmates in DOCS facilities have been compliant with their ART therapy and have succeeded in raising their T-cell counts during their incarceratory term.
Moreover, Dr. Lang noted that while most of the HIV-positive patients in the system are presently on triple-drug ART therapy, DOCS has had occasion to manage patients using from four to six ART medications. She opined that an individual who entered DOCS while on an established treatment regimen of five antiretroviral drugs for the proceeding year would be continued on that regimen and that course of treatment would not be changed or in any way modified, absent some medical reason to do so, e.g., that the patient was no longer responding to some or all of the drugs or was no longer able to tolerate some or all of the drugs. She also stated that DOCS does not determine the patient’s treatment regimen based upon administrative conditions, but rather based upon the individual needs of the particular patient.
While acknowledging that inmates will, despite these efforts, on occasion miss medication dosages, Dr. Lang observed that DOCS health care personnel are trained to educate the inmate HIV patient population regarding the importance of adherence to their treatment regimen. Among the mechanisms in place to reduce the chance that frequent inmate transfers result in missed medications are the policy of transferring inmates together with their medications and medical records, having them seen by medical personnel within 24 hours of their ar *868 rival at the receiving facility, having a blood test done on the first or second day after their arrival in the receiving facility and having access to immediate emergency care, as well as access to on-site and off-site pharmacies in the event that they are still without medication. Staff and inmates are also trained to recognize that, in accordance with the scientific findings, there is less risk of developing resistance to a drug if the patient skips the entire administration of medication, rather than merely skipping some of the drugs needed for the full “cocktail.”
Although the defense has suggested that DOCS physicians could reduce a patient’s ART from five drugs to four purely for economic or administrative reasons, I find nothing in this record to support an assumption that such a potentially detrimental and medically unwarranted change would be made in defendant’s case. I credit Dr. Lang’s testimony that there would be no medication change until the physician had done a complete physical examination and taken a . complete medical history of the patient and that the change would only be effected based upon the existence of clinical indications of a need to do so. Upon entry into the DOCS system, patients are permitted to bring their medical records with them, as well as a request from their treating doctor that the DOCS physician contact him or her. Although the DOCS physician will ultimately determine the inmate’s treatment regimen, they will maintain the patient on the existing treatment regimen so long as is medically appropriate. Although this determination may be made by a DOCS staff physician who is not necessarily an infectious disease specialist, all of the DOCS physicians have an.extensive history of treating HIV patients and now have ready access to HIV specialists.
In light of this evidence, I do not find convincing Dr. Fischer’s sweeping conclusion that the level of care given to patients with HIV disease within the State prison system is “substandard,” or below national standards. Dr. Fisher based his opinion upon his service between 1990 and 1993 as physician in charge of an inpatient prison unit at St. Clare’s Hospital and, apparently, upon the experience of the inmates he treated at Bellevue Hospital from 1997 to 1999, who more likely were incarcerated in the New York City, rather than the State, correctional system. Dr. Fischer’s conclusion that defendant would die if he were to be sent to State prison was founded upon speculation, information received from undisclosed sources and outdated experience, rather than based upon a firsthand *869 familiarity with the levels of care currently being offered at the State prison facilities, which, admittedly, he has never visited.
Although the Correctional Association Report makes clear that more can and should be done to improve the level of medical care afforded to DOCS inmates, including the hiring of better trained physicians, it does not establish that the treatment available to prisoners with HIV fails to meet national standards. To the contrary, the Report confirms that DOCS provides state-of-the-art medication, including ART, and has succeeded in achieving a remarkable reduction in AIDS-related deaths in recent years. While the study reported inadequacies during the study period of 1998-1999 in the information DOCS doctors provided to inmates regarding the administration and side effects of ART, and, in isolated instances, dispensed the wrong medication, improper medication administrations occur occasionally in the private sector, and even in major teaching hospitals. Moreover, DOCS has, since that time, developed educational videos employing peer counseling for inmates, and incorporates regular in-service training of its staff by outside specialists at Albany Medical Center in an effort to assure that DOCS medical staff are informed of all relevant current information on ART therapy, including its complications. Furthermore, this comprehensive examination of the prison health system failed to note any deficiencies in patient care arising from interruptions in medication regimens during inmate transfers, which was the principal concern of defendant in these proceedings.
Defendant would be entering the State prison system already stabilized on a particular ART regimen which is currently proving successful in minimizing his viral load, maintaining his T-cell level, and rendering him presently virtually symptom free, and as to which he is knowledgeable of both the proper dosage and side effects. His ART medication regimen is self-administered, and he would travel between facilities with a supply of ART drugs, his medical records and contact information for the infectious disease specialist who has been treating him for the past four years. Under the particular circumstances presented in this case, it appears highly likely that defendant will be able to continue his current treatment regimen and obtain adequate medical services while he serves his State prison sentence.
Conclusions of Law
The issue presented is whether defendant’s incarceration pursuant to his plea agreements would prevent him from *870 continuing his specialized course of ART treatment for his AIDS-related condition, thereby causing a deterioration which would ultimately result in his death.
The defendant maintains that he should not be compelled to serve his State prison sentence because of a virtual certainty that his schedule of ART medication administration will be disrupted while he is in the correctional system, and assumes that the extent of the interruptions will rise to a level that will prove fatal. The defendant argues that there is potential that he may be treated by a DOCS physician who may alter his five-drug, ART therapy without sufficient knowledge of his medical history, to defendant’s detriment. Defendant also argues that his extensive previous treatment record, as well as his current complex treatment regimen of five medications taken three times a day, makes him more fragile than most other AIDS patients in the State prison population. Finally, defendant urges the court to disregard the People’s evidence as merely speaking in generalities, without addressing the specifics of his unique case.
It is the People’s position, on the other hand, that the defendant’s present medical condition should not preclude him from serving his negotiated prison sentence, and that he should not be permitted to evade the consequences of his criminal behavior merely because of his AIDS diagnosis. The People take the position that the defendant’s ART regimen of five pills, which are readily available at DOCS pharmacies, is neither exceptional nor rare, and that his T-cell count of 182, while unusual, does not make him in any way unique among the inmates diagnosed with AIDS and who have been satisfactorily treated in the DOCS system.
The People further observe that the defendant was fully aware of his medical condition at the time he knowingly and voluntarily entered his guilty pleas and agreed to accept as punishment a sentence of from three to six years’ incarceration. They contend that defendant’s concealment of his medical condition from his own lawyer until shortly before his scheduled sentencing date and of his impending prison sentence from his physician should not now inure to his benefit. In this regard, the People argue that defendant is no more deserving of a sentence modification than was the defendant in People v Baghai-Kermani (221 AD2d 219 [1st Dept 1995]), who sought modification of his prison sentence due to deteriorating health, while at the same time refusing to undergo a biopsy or low-risk surgery for a brain tumor.
*871 The applicable legal standard that governs this inquiry was enunciated in Browarnik (42 AD2d 953, supra): “[U]nless incarceration would probably cause defendant’s death[,] he should be made to serve the sentence.” Furthermore, the defendant has the burden of establishing relevant facts relating to his deteriorating health condition by medical proof which “convincingly establishes” that incarceration would have an extremely deleterious impact on his condition. (People v Baghai-Kermani, supra, at 220.) A defendant who seeks a reduction of an otherwise appropriate sentence based upon his current medical condition must establish “that he would be unable to obtain proper medical treatment if incarcerated.” (People v Bellilli, 270 AD2d 355 [2d Dept 2000].) Finally, it is well settled that a defendant’s HTV-positive status is not necessarily, in and of itself, a ground for reducing an otherwise appropriate sentence. (See, e.g., People v Roy, 248 AD2d 566 [2d Dept], lv denied 92 NY2d 860 [1998]; People v Branham, 208 AD2d 361 [1st Dept], lv denied 84 NY2d 933 [1994]; People v Chrzanowski, 147 AD2d 652 [2d Dept], lv denied 74 NY2d 662 [1989]; People v Brandow, 139 AD2d 819 [3d Dept], lv denied 72 NY2d 856 [1988]; People v Napolitano, 138 AD2d 414 [2d Dept 1988].)
It is the court’s duty in reviewing the defendant’s sentence to examine the record in light of the objectives of the penal system and to make a decision based on the particular facts of the case. Generally, criminal punishment is designed to further four goals: deterrence, rehabilitation, retribution, and isolation. The sentencing court must weigh the demands of the community for punishment against the individual posture of the defendant. (People v Notey, 72 AD2d 279, 282 [2d Dept 1980].) Although an individual’s physical condition is a factor which may be reviewed when considering whether to reduce a sentence (People v Warden, 141 AD2d 913, 914 [3d Dept 1988]), the defendant’s prior criminal history, which here includes three prior felony convictions, is a relevant factor for the court to consider in determining whether a particular sentence is unduly harsh. (See, People v Brandow, supra.) Ultimately, the court must balance society’s interest in carrying out these multiple sentencing objectives against the need to temper justice with mercy in the case of individuals within the criminal justice system whose lives have been devastated by AIDS and its attendant hardships. (See, People v Baghai-Kermani, supra, at 221.)
While the standard of medical care within DOCS facilities once lagged far behind national standards, it can no longer be *872 said that a New York State prison sentence is tantamount to a sentence of death for a person with AIDS. Both the evidence adduced by the People and the Correctional Association Report demonstrate that DOCS has taken very seriously its obligations as a major provider of AIDS services within New York State and has dramatically improved AIDS-related service delivery to its inmate population. In fact, DOCS now employs state-of-the-art standards in meeting the needs of HIV-positive prisoners, employing the most recently available medications, including all of the ART medications now being taken by the defendant. DOCS has received national recognition for its leadership in the treatment of AIDS, and has implemented a comprehensive range of policies and procedures for the treatment of AIDS that are updated and revised regularly, to ensure consistency with evolving national standards of care. Its unique initiatives in educating both its correctional staff and its inmate population on the proper management of HIV care, including the strict adherence to ART protocol, have served as a model nationally.
Although the People’s evidence relates to prison conditions generally, rather than addressing defendant’s specific circumstance, it is the burden of the defense to establish convincingly that the level of treatment that the defendant will receive through DOCS will imperil his health. Dr. Fischer’s opinion concerning the “substandard” level of care the defendant will receive from DOCS was based largely upon his experience treating AIDS inmates 7 to 10 years ago, when the quality of treatment afforded to inmates did not approximate the level of care available today, rather than upon any review of the service level presently provided by DOCS. Moreover, Dr. Fischer’s conclusion that defendant’s therapy would be interrupted “at every point within the prison house system” is speculative at best, finds no support in the Correctional Association Report, and is refuted by the testimony of Dr. Lang, which detailed the steps that are taken by DOCS to ensure continuity of treatment during inmate transfers.
DOCS today can and does treat inmates with AIDS whose medical condition is similar to that of defendant. Contrary to the defense arguments, neither defendant’s treatment regimen nor his CD-4 count renders his medical status unique. Defendant’s own expert concedes that approximately 10% of all HIV-positive individuals are now receiving a five-drug course of treatment, and the unrefuted evidence at the hearing establishes that DOCS has successfully managed treatment *873 and inmates having lower T-cell counts than that of defendant. In fact, although defendant’s condition apparently is more fragile than that of many other prisoners with AIDS, the risk of danger of developing a drug-resistant virus is not unique to defendant, but rather universal among persons carrying the HIV retrovirus and receiving ART combination therapy, and is the subject of DOCS correctional health protocols and training sessions.
Defendant’s situation is clearly distinguishable from that presented in People v Notey (72 AD2d 279, supra), where the Court found “extraordinary circumstances” and modified a prison sentence that was imposed upon a 73-year-old doctor with no prior criminal record. There the defendant’s medical picture was truly unique: he suffered from a rare and serious urological condition which could be treated only in a hospital, and only by a specific physician through an operative procedure. In Notey, medical testimony established that treatment in a prison setting would be virtually impossible, and if attempted, would prove “perilous to the life of the defendant.” (Id., at 285.)
No such showing has been made here. In defendant’s case, DOCS administers sophisticated regimens of treatment to prisoners with HIV and AIDS and also takes steps to ensure continuity of treatment to minimize the risk of a patient developing a drug-resistant strain of HIV due to an interruption in treatment. Its own Practice Guideline, which its physicians are required to follow, requires such informed treatment protocols be used by DOCS medical personnel. The evidence adduced at this hearing thus does not support the conclusion that it would be impossible for defendant to receive his necessary treatment while in prison.
The AIDS Reader Literature Review, uncontroverted in these proceedings as an authoritative source on the current state of medical and scientific knowledge on ART, demonstrates that an inmate would have to miss at least 7% or more of his medication administrations before such interruption in treatment could lead to drug resistance. Dr. Fischer opined that missing 5% of the scheduled administrations could produce a mutation in the virus which could lead to a drug resistance. While it is clear that HIV is an exceedingly complex disease, requiring careful monitoring and treatment for symptom management, the defense has failed to meet the applicable legal standard of convincingly establishing that defendant would “probably” miss even the 5% of his treatments which Dr. *874 Fischer finds necessary to place him in peril of developing a drug-resistant strain of HIV. (People v Browarnik, 42 AD2d 953, supra.) Moreover, the defense failed to establish through the testimony of Dr. Fischer that defendant, who is now virtually symptom free, could not survive a prison sentence of three to six years, as Dr. Fischer was unable to render an opinion with any consistency as to the defendant’s life expectancy, testifying at one point that incarceration would result in the defendant’s death within six to 12 months, at another point, one to two years, and finally that he could not opine on defendant’s chances of surviving his three- to six-year sentence, as contrasted with a life expectancy of several years, were he allowed to continue on his medication.
It cannot realistically be assumed that the medical treatment defendant will receive in prison will necessarily be of the same caliber as that which he currently receives from his private physician. Nonetheless, the standards established by the Practice Guideline, and as to which all DOCS medical personnel are trained and directed to adhere, would, according to the Correctional Association Report (and even according to the testimony of defendant’s own expert), appear to afford him adequate medical care as measured both by nationally recognized standards and his own needs, notwithstanding the fragility and unusual nature of his condition.
Specifically, defendant could be assigned to a level one facility, where a medical doctor is on site or on call 24 hours a day, and 24-hour nursing staff is available, for as long as he needed frequent monitoring. He could have access to an on-site HIV clinic, and regularly consult with an HIV specialist. All five of his ART medications could be provided to him by the facility for self-administration in accordance with his current treatment regimen, unless or until they became medically contraindicated due to adverse effects or a lack of efficacy. Defendant would be monitored for viral load and CD-4 count levels at four-week intervals until his stability on two- to three-month monitoring was assured, in conformity with the Practice Guideline. If defendant’s condition warranted it, or if he were to experience symptoms, DOCS’ standard operating procedures pursuant to the Guideline would result in more frequent testing and monitoring. In addition, defendant could request that Dr. Fischer provide his treatment or offer consultation to DOCS medical staff to enhance defendant’s continuity of care. These measures would appear to establish a level of care for the defendant which is consistent with, and adequate for a continua *875 tion of, the ART treatment and monitoring he currently receives. Finally, should he become severely physically ill, defendant may seek early release on medical parole.
Thus, it cannot be said that the defendant has convincingly established through medical proof that he would be unable to receive appropriate treatment while incarcerated or that imprisonment would likely have an “extremely deleterious impact” on his condition. (People v Baghai-Kermani, 221 AD2d, supra, at 220.)
Therefore, this court finds that the defendant has failed to meet his burden under Browarnik (supra) of demonstrating that incarceration would probably cause his death, and accordingly denies defendant’s application to modify the agreed sentence of three to six years’ incarceration.
The AIDS epidemic has given new meaning to the requirement of Estelle v Gamble (429 US 97, 103 [1976]) that the government is obligated to provide adequate medical care to those whom it incarcerates. Although our State correctional health system has improved significantly in recent years, especially with respect to the provision of services to HIV-positive inmates, the Correctional Association Report makes clear that much remains to be done to improve the quality of care to the 1,000,000 patients served by DOCS health care providers each year, even with regard to HIV-related services.[8] As provision of adequate health services to this population is not only constitutionally mandated, but also ultimately redounds to the benefit of the public as a whole, State policymakers in both the legislative and executive branches should make a priority of directing more resources to the improvement of New York’s correctional health services.
Although this court finds that this is not the “rare case” with “exceptional circumstances” which would warrant the vacating of defendant’s prison sentence (see, People v Baghai-Kermani, supra, at 220), I believe it appropriate for this court to attempt to fashion procedures that will assure continuity in defendant’s essential treatment regimen without interruption while he is incarcerated by issuance of a supplemental order at the time of sentence, settled on notice, to ensure the implementation of this decision. (See, People v Warden, supra, 141 AD2d, at 914.)
Accordingly, for all the reasons stated, defendant’s motion to *876 modify the terms of his impending sentence is denied. Defendant is directed to surrender himself to the court for sentencing on October 26, 2000.

. Defendant states that if he obtains a favorable ruling at the conclusion of this hearing, he will either seek to withdraw his guilty plea or move pursuant to CPL 210.40 and People v Clayton (41 AD2d 204 [2d Dept 1973]) for dismissal of the indictment in furtherance of justice.

. I found Dr. Fischer qualified to render a professional opinion on the subject of the diagnosis and treatment of HIV and AIDS.

. Dr. Lang was proffered and recognized as qualified to render a professional opinion on the subject of health services available to inmates within the New York State prison system.

. See, e.g., K. E. Finkelstein, City Dropping Managed Care For Its Jails After Disputes, NY Times, June 22, 2000, section B, at 1, col 5 (reporting on City’s decision not to renew contract with St. Barnabas after numerous reports of its medical neglect of inmates and in light of ongoing investigation by Manhattan District Attorney into criminal negligence in the hospital’s treatment of prisoners who later died); see also, E. Lipton, New York Jails Pose Biggest Test For Health Firm With Mixed Past, NY Times, Sept. 25, 2000, section A, at 1, col 1.

. During the years Fischer was working with New York State inmates at St. Clare’s, i.e., 1990-1993, the AIDS mortality rate within the New York State prison population was between 32 and 40 AIDS-related deaths per 10,000 population.

. Fischer apparently was referring to there being any modification or interruption in the treatment regimen, however minor or temporary.

. For example, prevention of HIV transmission could be enhanced were DOCS to follow the example of the New York City Department of Correction and make condoms available to inmates in its facilities.