■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JONATHAN WILLIAMS, Also Known as HAROLD T. GRISWOLD, Appellant. [664 NYS2d 835] —Cardona, P. J. Appeal from a judgment of the County Court of Schenectady County (Eidens, J.), rendered March 8, 1996, upon a verdict convicting defendant of the crimes of attempted murder in the second degree, assault in the first degree, criminal possession of a weapon in the second degree and criminal use of a firearm in the first degree.

On May 12, 1995, at approximately 8:30 P.M. in the City of Schenectady, Schenectady County, Gary Richards was shot as he drove away from the scene of a cocaine purchase. Defendant was charged in a six-count indictment with attempted murder in the second degree, three counts of assault in the first degree, criminal possession of a weapon in the second degree and criminal use of a firearm in the first degree. Following denial of his suppression motions, defendant was tried before a jury and convicted of attempted murder in the second degree, one count of assault in the first degree, criminal possession of a weapon in the second degree and criminal use of a firearm in the first degree. He was sentenced to concurrent indeterminate terms of imprisonment totaling 8⅓ to 25 years. Defendant appeals.

Initially, defendant contends that his oral statement to the police was the product of an illegal seizure. The relevant facts pertaining to defendant's encounter with the police are drawn from the suppression hearing. During the evening hours of May 12, 1995 Schenectady Police Investigator Robert McHugh interviewed Terrence Thomas, a witness to the shooting. He learned that Thomas was an acquaintance of defendant and had been with him that day. McHugh also learned that Thomas lived in the vicinity of the shooting at 1325 Fourth Avenue.

Valerie Cherny, another witness, gave McHugh a physical description of the shooter as a black male in his late teens to mid-20s, about 5 feet, 9 inches tall with a medium build who wore his hair in little pieces that were twisted or curled. Working with Cherny, McHugh created a composite picture of the perpetrator which was finished around 1:00 A.M. on May 13, 1995. McHugh also spoke with Thomas' mother, Delaine Jones, who witnessed the shooting; after viewing the composite, Jones indicated that it looked like the shooter. From the witnesses, McHugh learned the first name of the shooter to be John.

On the morning of May 13, 1995, Schenectady Police Officers Nicola Messere and John Borowski were assigned to assist the detectives investigating the shooting. At morning lineup, they were told that a nine-millimeter semiautomatic handgun had been used and was still on the street, that Thomas and his mother had witnessed the shooting, and that the suspect, whose first name might be John, was known to be at the Thomas home at 1325 Fourth Avenue. They also had the description of the suspect as well as his composite picture.

Messere knew Thomas from the street and was aware that the investigators wanted to speak to him again. At approximately 11:30 A.M. Messere saw Thomas, Cecil Tucker and another black male, who he did not know, in front of 1325 Fourth Avenue about to enter Tucker's car. Messere pulled in front of Tucker's car so that it could not leave. While Messere exited his car, Borowski radioed the investigators. Messere approached the three men with his hand on his gun. He told them to put their hands on the car and they complied. Messere told the men that he was going to pat them down because they were investigating a shooting and the investigators wanted to talk to Thomas. Messere's pat down of their outer clothing revealed no gun. The investigators arrived at the scene about a minute later along with other patrol cars. Messere observed that the unknown male fit the composite picture and description of the suspect except that his hair was closely cropped. He asked defendant his name. Defendant responded "Harold Griswold" and, without request, gave Messere his date of birth. The National Crime Information Center check for a Harold Griswold using the birthdate provided came back negative. The investigators sent everyone on their way and left. At no time was defendant restrained, handcuffed, placed inside the police car or threatened. The entire stop lasted no more than 15 minutes.

During the investigation it was learned that the shooter could have come from the Spring Valley area in Rockland

County. McHugh called the Spring Valley Village Police Department and asked about a "Harold Griswold". A computer check by that department revealed that a Harold Griswold was an alias used by Jonathan Williams. McHugh obtained a photo of Williams and included it in a photo array shown to Cherny and Richards. Cherny identified defendant as the shooter. Richards identified defendant as the person who sold him cocaine. An arrest warrant was issued and defendant was apprehended.

We reject defendant's contention that the police-initiated encounter in this case constituted a seizure and find instead that the officers' conduct never exceeded the level of a request for information. In doing so, "we * * * consider first whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible" (*People v De Bour*, 40 NY2d 210, 215). Here, Messere and the investigators had an "articulable reason not necessarily related to criminality for making the approach" to the group (*People v Hollman*, 79 NY2d 181, 190). They wished to speak to a witness who was previously interviewed. Thus, they were not acting "on whim or caprice" (*id.*, at 190). Although it might appear that Messere's actions in blocking Tucker's automobile, approaching the group with his hand on his gun and directing them to submit to a pat down were far too intrusive to be labeled a request for information, it must be remembered that the police were investigating a grave crime, an attempted murder, which had occurred only hours earlier in the same vicinity, perpetrated by a suspect armed with a semiautomatic handgun who was known to have been in Thomas' company. Thus, we find that the intensity and manner of the officers' interference with defendant was reasonably related to the circumstances attending the encounter.

Furthermore, in our view, the pivotal factor which prevented the encounter from escalating beyond a request for information was the absence of any questioning which could have led defendant "reasonably to believe that he * * * [was] suspected of some wrongdoing and [was] the focus of the officer's investigation" (*id.*, at 185). That was clearly not the situation here, for defendant was only asked his name. He was not even asked for identification to prove his identity (*cf.*, *People v De Bour, supra*, at 219). Although the length of the detention lasted some 15 minutes, we note that defendant and the others were sent on their way as soon as the computer check came back negative (*compare*, *People v Banks*, 85 NY2d 558, *cert denied* 516 US 868). Accordingly, we find that County Court properly denied defendant's motion to suppress his oral statements.

We find no merit to defendant's contention that the photo array from which he was identified was suggestive because it depicted him wearing a chain around his neck that was arguably similar to those used by some police agencies (though not the Schenectady Police Department) to hold up mug-shot placards. "A photographic array is suggestive when some characteristic of one picture draws the viewer's attention in such a way as to indicate that the police have made a particular selection" (*People v Brown*, 169 AD2d 934, 935, *lv denied* 77 NY2d 958; *see, People v Emmons*, 123 AD2d 475, 476, *lv denied* 69 NY2d 827). Notably, all of the men depicted in the six-person array are shown in street clothing and, furthermore, the chain could be viewed as a mere piece of jewelry rather than as part of the booking process. Moreover, nothing in the record indicates that either witness had any knowledge of booking procedures at the Schenectady Police Department or elsewhere. Therefore, we find that the presence of the chain did not impermissibly draw attention to defendant's photograph (*see, People v Brown, supra*).

Defendant next contends that the ballistics testimony of Charles Boone, his notes and reports, as well as the testimony of Schenectady Police Officer Michael Seber, violated the terms of the parties' voluntary disclosure agreement (hereinafter the agreement). That agreement provided for reciprocal discovery of "all items discoverable pursuant to CPL * * * 240.20 (1)". The agreement also provided that it was a continuing one, that materials obtained after the specified time period were to be disclosed within 15 days after they were obtained or prior to the commencement of trial, whichever came first, and that witness lists would be exchanged immediately prior to trial. Although the agreement requires both parties to disclose trial evidence prior to the commencement of the trial at the latest, we conclude that the testimony of both witnesses and the supporting documents were properly admitted at trial.

The record reveals that the People did not receive the ballistics report (dated Jan. 10, 1996) until Thursday, January 11, 1996 at approximately 10:00 A.M. Jury selection, which began that Thursday and consumed the entire day, continued until 4:00 or 4:30 P.M. on Friday so that it appears that the prosecutor was not personally aware of the document's receipt until the weekend. Since Monday, January 15, 1996 was a legal holiday, the People did not exhibit bad faith or lack of reasonable diligence in making the report available to the defense for the first time on Tuesday, January 16, 1996, before the start of testimony. We further note that County Court adjourned the

trial until the following Monday, January 22, 1996, which obviated any prejudice to defendant (*see, People v Colavito*, 87 NY2d 423, 429).

Prior to the start of the trial, the People supplied defense counsel with a list of witnesses; Seber, however, was not on the list. The CPL does not compel the production of witness lists except when a defendant asserts an alibi defense (*see,* CPL 250.20). Although the agreement called for the parties to exchange witness lists, it did not state that the lists were exclusive. Furthermore, "[t]he discovery of witnesses rests in the trial court's discretion" (*People v Coleman*, 178 AD2d 842, 844, *revd on other grounds* 81 NY2d 826). Here, we cannot say that County Court abused its discretion in permitting Seber to testify.

We next address defendant's contention that County Court erred by ruling that the People could, if defendant took the stand, use the underlying fact pattern of a 1990 charge alleging the unauthorized use of a motor vehicle in the third degree. The underlying fact pattern of the 1990 charge bore no similarity to the fact pattern which formed the basis for the charges at trial. In our view, County Court appropriately balanced the *Sandoval* factors (*see, People v Sandoval*, 34 NY2d 371, 374-375), including defendant's demonstrated willingness to place his interest over that of society, in arriving at its conclusion that the probative value of the 1990 charge outweighed the possibility of prejudice to defendant (*see, People v Strauss*, 238 AD2d 721, 723). Accordingly, we find no abuse of discretion.

Defendant also contends that he was deprived of a fair trial after County Court failed to excuse two jurors challenged for cause and he was forced to exhaust his peremptory challenges before selection of the jury was complete (*see,* CPL 270.20 [2]; *People v Butts*, 140 AD2d 739, 740). During voir dire juror No. 179 stated that he knew the prosecutor's grandmother because she had been his teacher for eight years and that he might not be able to be fair and impartial. Upon further questioning, however, juror No. 179 stated that he could follow the court's instructions and that his knowing the prosecutor's grandmother would have nothing to do with defendant. Since these facts "show little more than a nodding acquaintance" between juror No. 179 and the prosecutor's grandmother (*People v Provenzano*, 50 NY2d 420, 425), we cannot say "as a matter of law, that the relationship testified to was 'likely to preclude' [CPL 270.20 (1) (c)] the potential juror from giving an impartial verdict" (*id.,* at 424). Thus, it was not error for County Court to deny defendant's challenge for cause.

Defendant also contends that County Court erred in denying his challenge of juror No. 76 because that juror had apparently served on a civil trial petit jury only two years earlier. Judiciary Law § 524 (a) states, in pertinent part, that: "A person who has served on a * * * petit jury in any court of record * * * shall not be competent to serve again as a trial * * * juror in any court of the unified court system for four years subsequent to the last day of such service." While it would have been the better course to disqualify juror No. 76 based on his prior service within the four-year period, Judiciary Law § 524 (b) provides that a jury verdict returned by a trial jury composed of one or more trial jurors not competent by virtue of previous service shall not be invalidated. Thus, reversal of defendant's convictions on this ground is not warranted.

Finally, we find that defendant's remaining contention regarding the propriety of the People's voir dire of prospective jurors was not preserved for appellate review by an appropriate objection (see, CPL 470.05 [2]; People v Butler, 214 AD2d 1014, 1015, lv denied 86 NY2d 791).

Mikoll, Mercure, Yesawich Jr. and Carpinello, JJ., concur. Ordered that the judgment is affirmed.