■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ONORIO FELIX, Appellant. [805 NYS2d 825]—

Judgment, Supreme Court, New York County (Gregory Carro, J.), rendered August 4, 2003, convicting defendant, after a jury trial, of manslaughter in the first degree, and sentencing him to a term of 25 years, modified, as a matter of discretion in the interest of justice, to reduce the term to 15 years, and otherwise affirmed.

Defendant's challenge to the court's instruction on the justification defense is unpreserved, and we decline to review it in the interest of justice. Were we to review this claim, we would find that this instruction, read as a whole (*see People v Coleman,* 70 NY2d 817 [1987]), sufficiently conveyed the appropriate legal standards, including the principle that defendant's duty to retreat arose at the time he exerted deadly physical force.

As to the sentence, defendant was convicted of the lesser charge of manslaughter in the first degree. Under the circumstances of this case, the sentence imposed was excessive and is reduced to 15 years. Concur—Andrias, Ellerin, Nardelli and Sweeny, JJ.

Tom, J.P., dissents in part in a memorandum as follows: I perceive no reason to reduce the sentence imposed on a defendant who, in the afternoon, threatened to kill Melvin Martinez if he ever saw him again and, in the evening, upon seeing him, did exactly that by plunging a knife with an eight-inch blade into the victim's heart. This case is devoid of any mitigating circumstances to warrant reduction of the sentence by more than a third—from 25 years to 15 years. I therefore respectfully dissent and would affirm the judgment of conviction in all respects.

Defendant and the victim were employed by Jose Martinez (no relation) to do construction work. While the two employees had initially been friends, defendant developed animosity toward Melvin. Although Melvin was an inferior worker in defendant's estimation, Melvin took credit for all the work they performed and generally blamed defendant for any mistakes that were made. This led to numerous arguments, which resulted in the loss of a construction job in Westchester County.

On the afternoon of the crime, Jose, who also managed a bodega in Manhattan, drove to Queens, accompanied by defendant, to obtain a part for a toaster that Melvin was repairing. Defendant stated that "he never came past the store because if he sees Melvin he'll kill him because Melvin is always on his back." In the hour-and-a-half that they were in the car, Jose did not detect any sign that defendant had been drinking.

During the remainder of the afternoon, Jose received a number of telephone calls at the bodega from defendant, who wanted to borrow money so that he could go out that evening. The calls were sufficiently numerous that Jose stopped answering the telephone. At about 8:40 P.M., Jose saw that defendant was again calling him on his cellular phone and did not answer. Moments later, defendant, who appeared to have been drinking, entered the store and accused Jose of avoiding his calls.* When defendant threw beer that splashed on Helen Solano (Melvin's sister-in-law), Jose started to physically remove defendant from the premises. When defendant saw Helen reaching for the telephone, presumably to call the police, he picked up a knife with an eight-inch blade and threatened to kill her. Jose restrained him and convinced him to get into a cab and go home. When Jose opened the cab door, defendant tucked the knife into his waistband. As defendant was about to enter the vehicle, he saw Melvin exit the store. Defendant slammed the car door and walked toward Melvin, stating, "It's you I'm going to kill. It's you I want to kill." Jose managed to get between the two men and to restrain defendant, who pushed them back toward the store while attempting to stab Melvin over Jose's shoulder. Jose stepped out from between the two men and saw defendant attempt to stab at Melvin's heart. Jose "jumped [defendant] from behind and grabbed the knife," at which point defendant ran off. Jose saw Melvin slump down against the wall of the store. He was not aware that Melvin had been fatally injured and only saw the wound when he turned Melvin over.

Police arrived on the scene to find defendant in the middle of a crowd of 30 to 40 people, being kicked and punched. According to one responding officer, "Some of them were even saying, oh, this guy killed a guy up the block." Defendant was taken into custody and transported to the 33rd Precinct House, where he gave a signed statement in which he alleged that Melvin had initiated the conflict: "Melvin struck Mr. Felix with a fist to Mr. Felix's right eye. Mr. Felix ran out of the store went to a fruit stand where they make juices and grabbed a knife. Melvin approached Mr. Felix and began hitting Mr. Felix. Mr. Felix then stated he defended himself and swung his hands in an outward manner almost pushing Melvin away. So he stated he did slash Melvin but did not stab him. Melvin then dropped to the floor."

A pathologist from the Medical Examiner's Office testified that the victim's body bore a single puncture wound. She stated that the knife entered Melvin's chest, left of the midline, be-

---

* The court gave instructions on intoxication, which the jury obviously rejected as a defense to intentional manslaughter.

tween the ribs to a depth of three to five inches, penetrating the right side of the heart. She described the damage to the heart as "significant" and stated that it was likely that death resulted "fairly quickly."

Defendant confirmed that he had accompanied Jose Martinez to Queens on the afternoon of the crime and that he had gone to Jose's store at around 9:00 P.M. He further conceded that he had thrown beer at Helen and others and that Jose had shoved him out of the store. Defendant testified that, once outside, he picked up the knife from a fruit stand in front of the store, maintaining that he was only defending himself from an attack by Jose and Melvin. However, he was "not exactly clear as to what happened," although he conceded that he saw no weapon being used against him. As to the actual stabbing, defendant persistently maintained, "I don't know how I did it."

The jury heard testimony from three other witnesses who were in the store during the incident. Their testimony was wholly consistent with that given by Jose Martinez. The jury convicted defendant of intentional manslaughter but acquitted him of intentional murder. Noting that defendant exhibited no remorse, the court imposed the maximum determinate sentence of 25 years, explaining, "It is the opinion of the Court that you were given a break by this jury in that they didn't find you guilty of intentional murder."

As the trial court accurately discerned, this was a senseless and deliberate assault, and there is no dispute—even on defendant's part—that he caused the death of Melvin Martinez, leaving a bereaved widow to care for two preschool orphans. The single stab wound to the chest belies defendant's contention that he was only attempting to "slash" at his victim to defend himself. Given the viciousness of the attack, committed despite efforts to restrain defendant, the court was warranted in imposing the maximum penalty.

I perceive no reason to accord defendant any leniency. By his testimony, defendant did not attempt to explain his actions so much as to excuse them. Defendant never asserted that he considered Melvin Martinez to be a threat to his physical safety (*cf. People v Matias*, 161 AD2d 292 [1990]), yet he portrayed his flailing at the victim with a knife as "defending myself." The beer defendant allegedly consumed prior to the confrontation does not excuse his actions; nor does it require the court to refrain from imposing the maximum sentence (*see People v Harrison*, 188 AD2d 374 [1992], *affd* 82 NY2d 693 [1993]). Other excuses mentioned are the emotional impact of the death of his father, whose funeral defendant did not attend, a month before;

the necessity to defend himself from the hurling of apples by Helen Solano (the victim's sister-in-law) and the intervention of the unarmed Jose Martinez; and his supposed remorse, delivered in such self-centered expressions of concern as "this has destroyed me," "I have lost my youth already," and "I know what I am going through." Despite defendant's concession that he took a life, he ultimately denied responsibility for his actions, proclaiming, "I don't know how I did it," and "I don't remember anything."

In sum, this was an unprovoked, cold-blooded and deliberate killing, with no mitigating circumstances and little or no remorse on the part of defendant. The case raises no concern that the court misapprehended defendant's record in imposing sentence because this is his first conviction (*cf. People v Diaz,* 118 AD2d 651 [1986], *lv denied* 68 NY2d 769 [1986]). Moreover, as this Court has observed under similar circumstances, the lack of a prior record does not warrant forbearance in sentencing where an unarmed victim is subjected to a relentless, fatal assault—even where, as here, the defendant is convicted of manslaughter and acquitted of murder (*see Harrison,* 188 AD2d at 375). The trial court did not abuse its discretion in imposing the sentence, given the factual circumstances and the evidence presented in this case. The court recognized the serious nature of this senseless killing and, after observing defendant at trial, rejected his claims of remorse. Thus, I find no reason for this Court's indulgence in the 40% reduction of defendant's sentence. Recognizing that the review of "whether an otherwise lawful sentence is harsh or severe in a particular case involves a type of discretion not reviewable by the Court of Appeals" (*People v Thompson,* 60 NY2d 513, 521 [1983]), it devolves upon this Court to ensure that its exercise of discretion serves the interests of justice.