■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EUGENIA PEDRAZA, Appellant. [808 NYS2d 58]—

Judgment, Supreme Court, Bronx County (Richard Lee Price, J.), rendered June 13, 2002, convicting defendant, after a jury trial, of kidnapping in the first degree, arson in the second degree and attempted murder in the second degree, and sentencing her to a term of 23 years to life, to be served consecutively to two concurrent 10-year terms, modified, as a matter of discretion in the interest of justice, to direct that the sentence for kidnapping be served concurrently with the sentences imposed for arson and attempted murder, and otherwise affirmed.

The court properly permitted the People to call a witness whose name was omitted from their list of prospective witnesses (*see People v Williams,* 243 AD2d 833, 837 [1997], *lv denied* 91 NY2d 926 [1998]). The record does not support defendant's assertion that, in formulating her trial strategy, she relied to her detriment on her expectation that the People would not call this witness. On the contrary, we conclude that there was no

substantial prejudice to defendant, particularly since the court accorded defendant ample time to prepare for cross-examination of the unexpected witness, and since defendant vigorously and extensively cross-examined the witness and exploited all the relevant circumstances to her advantage (*see People v McCorkle*, 272 AD2d 273, 275 [2000], *lv denied* 95 NY2d 936 [2000]).

With regard to sentencing, we believe that the aggregate sentence should be reduced by making all three sentences run concurrently, resulting in an aggregate term of 23 years to life. The dissent's preference to reduce the kidnapping sentence to 15 years to life—the minimum sentence for kidnapping in the first degree, a class A-I felony—is, on this record, unrealistic. We emphatically reject the dissent's characterization of defendant's crime as simply "the end product of a domestic dispute that escalated into intra-family conflict and . . . is also unlikely to recur." We also observe that the bland language the dissent uses to characterize the subject kidnapping—"in an attempt to locate [defendant's ex-husband], defendant's stepfather and two other men kidnapped [the ex-husband's] sister"— ignores the shocking reality of the events leading to the commission of this class A-I felony. In fact, what occurred was that the victim, the innocent sister of defendant's ex-husband, was kidnapped while on the way to work, threatened with a gun, beaten, bound, gagged and blindfolded, deprived of food and water, and finally left to die tied to a chair in a burning building, a particularly horrifying death from which the victim only escaped due to a combination of pure chance and her own extraordinary courage. We find inexplicable, and without support in this writing, the dissent's apparent interpretation of the foregoing factual description as an attempt, on our part, to characterize "defendant as a hardcore, violent criminal with a propensity to repeat violent criminal acts." What we are characterizing is not defendant's overall personality, but the criminal acts of which she has been found guilty, and those acts were undeniably violent and cruel.

Nor is there any factual support for the dissent's argument that defendant played no greater role in the commission of this crime than her codefendants, an argument that ignores the fact that defendant was the only one with a motive. Thus, it is fairly inferable that codefendants were mere instruments used to carry out defendant's scheme to get back at her ex-husband.

The dissent also appears to be conflicted in seemingly arguing for dismissal of the indictment, at the very least as to the arson and attempted murder charges, and classifies the victim's testimony as "false in material aspects," a conclusion that was

evidently not shared by the trier of fact. Defendant, in fact, does not even raise a legal sufficiency claim as to any of the convictions. Moreover, defendant, on appeal, does not challenge the victim's identification of her as being present in the apartment, yet the dissent inexplicably attempts to bootstrap this identification onto the victim's testimony that she heard defendant's voice one-half hour before the fire was started, which was not possible as defendant was in police custody at that time. The victim's confusion on this point is certainly understandable, considering the ordeal to which she had been subjected, and this point was brought up before the jury and, presumably, was considered and rejected by them.

Finally, in calling for a reduction of the sentence for kidnapping to 15 years, the dissent opines that there is "substantial doubt cast by the record upon defendant's direct participation" in this crime. The dissent, however, points to nothing in the record that casts doubt on defendant's participation in the kidnapping. Moreover, while the dissent refers to the "obviously incredible testimony" given by the victim and calls it "the only evidence to suggest that defendant personally participated in, or had any prior knowledge of, the arson and attempted murder," this ignores the fact that defendant was prosecuted under an acting in concert theory, i.e., that she "solicit[ed], request[ed], commands, importune[d], or intentionally aid[ed]" such person to engage in such conduct. Concur—Andrias, Friedman, Sullivan and Nardelli, JJ.

Tom, J.P., dissents in part in a memorandum as follows: While a trial justice is afforded considerable discretion in setting punishment, the sentence imposed upon this defendant is severe in the extreme. Even as modified by the majority, the resulting aggregate period of incarceration of 23 years to life, two years short of the maximum penalty for kidnapping of 25 years to life, is unduly harsh under the circumstances. Because the sentence is both grossly disproportionate to the punishment given to her accomplices and irreconcilable with recent rulings by this Court, I respectfully dissent and would modify the judgment of conviction to reduce the sentence for kidnapping to 15 years to life, the minimum sentence for an A-I felony, and provide that all sentences be served concurrently.

The facts of this case are straightforward. This crime was conceived following a family dispute in October 1999, when Julio Montecinos, defendant's husband and the father of her youngest child, ran off, allegedly taking with him an unspecified portion of defendant's earnings. After staying with a relative for a couple of weeks, Julio departed for Minnesota in the company of his girlfriend.

On December 29, 1999, in an attempt to locate Julio, defendant's stepfather and two other men kidnapped Julio's sister, Magali Montecinos, as defendant observed from a distance. The three men took Ms. Montecinos to an apartment in an abandoned building, where they questioned her concerning Julio's whereabouts. Later that night, after the Montecinos family notified the police, defendant was contacted in connection with the investigation. Sometime after midnight, she was taken by a detective to the 52nd precinct, where she remained until she was placed under arrest. During the hours defendant spent at the precinct house, her accomplices set fire to the apartment where Ms. Montecinos was being held captive. Before the fire was set, the captors freed one of Ms. Montecinos's hands so that she could drink water and left her hand free from restraint. She was able to free the other hand which was bound by duct tape and flee from the apartment by climbing down the fire escape. The fire caused no injuries other than the sprained ankle sustained by Ms. Montecinos when she jumped from the fire escape ladder.

The plot to kidnap Montecinos to ascertain the whereabouts of Julio was carried out by Serafin Rodriguez, defendant's stepfather, and two male accomplices that he recruited. All three entered guilty pleas. Rodriguez and one of the men each received a sentence of 10 years; the other received a sentence of four years.

In the course of pretrial proceedings, three judges attempted to negotiate a plea on behalf of defendant, but she refused to consider it. The record reflects that, on the verge of trial, the court attempted to arrange a plea that would have required defendant to serve a sentence of only seven years.

Eugenia Pedraza was the only defendant who elected to go to trial. She was found guilty on all counts and given an aggregate sentence of 33 years to life—23 years to life on the kidnapping charge, to run consecutively with two concurrent determinate terms of 10 years each on the arson and attempted murder charges.

The fairness of the criminal justice system requires that there be some measure of equality in the sentences meted out to defendants who commit the same or similar crimes. Simple logic suggests that conviction for an attempted offense should not result in punishment exceeding that generally imposed for the completed crime.

As an initial observation, the cumulative sentence of 33 years to life imposed by Supreme Court in this case exceeds the maximum sentence of 25 years to life frequently imposed for

the completed crime of murder in the second degree (*see e.g. People v Martinez*, 287 AD2d 353 [2001], *lv denied* 97 NY2d 685 [2001] [25 years to life for conviction of murder in the second degree, kidnapping in the second degree, and robbery in the first and second degrees]; *People v Torres*, 155 AD2d 383 [1989], *lv denied* 78 NY2d 1082 [1991] [conviction of four counts of murder in the second degree]; *People v Pabon*, 120 AD2d 685 [1986], *lv denied* 68 NY2d 1003 [1986] ["heinous" crime involving attempted robbery and murder]).

Murder does not always elicit the maximum penalty (*see People v Gayle*, 162 AD2d 261 [1990], *lv denied* 76 NY2d 857 [1990] [20 years to life for two counts of murder in the second degree]), even where the crime is committed in the course of a kidnapping (*People v Mauleon*, 266 AD2d 66 [1999], *lv denied* 94 NY2d 922 [2000] [concurrent 18-years-to-life terms for murder in the second degree and kidnapping in the first degree]). In a case where the proof of a defendant's direct participation in a murder was unconvincing, this Court reduced, as unduly harsh, a sentence of 25 years to life to a term of 15 years to life (*People v Clarke*, 286 AD2d 208 [2001], *lv denied* 97 NY2d 640 [2001] [execution-style murder]). Here, there was a lack of credible evidence to personally connect defendant to the acts comprising arson and attempted murder and the victim sustained no significant physical harm at the hands of her captors, yet the trial court imposed a sentence of 33 years to life for this first-time felon, essentially a life sentence for this woman. There is no rational basis to justify a sentence of 33 years, or even 23 years, under the factual circumstances of this case.

Even a career criminal has been accorded more leniency by this Court than defendant. We recently halved the sentence imposed on a persistent violent felony offender for two counts of robbery in the first degree by modifying the judgment of conviction to provide that two terms of 25 years to life be served concurrently, rather than consecutively (*People v Green*, 17 AD3d 223 [2005], *lv denied* 5 NY3d 789 [2005]). The defendant, a quintessential recidivist, had been arrested 27 times, amassing a record of 23 convictions, including six felony convictions.

The majority apparently regards defendant as a hard core, violent criminal with a propensity to repeat violent criminal acts. Defendant, however, has a general equivalency degree (GED) and, before the commission of the crime, was a housewife and a working mother, employed full time as a home attendant. Because her husband was habitually unemployed throughout their seven years of marriage, defendant was the sole means of support for the family, which includes an infant son who, at the

time sentence was imposed in June 2002, was only five years old.[1] Her record consists only of two minor misdemeanor convictions over a period of 17 years. In short, defendant hardly represents the typical vicious predator from whom society needs to be protected. Significantly, there is no evidence that defendant played any greater role in this crime than her accomplices, whose direct participation in the arson is not disputed, and the majority fails to otherwise explain why defendant deserves a sentence more than twice as long.

Consistency in the sentences imposed upon defendants who have been convicted of committing the same or similar crimes serves to engender public confidence in the integrity of our criminal justice system. Appropriate sentencing demonstrates that justice and fairness can be achieved in the punishment of criminals and the deterrence of crime. The draconian sentence imposed in this case neither serves justice by appropriately punishing defendant nor safeguards society from further criminal conduct. This crime is the end product of a domestic dispute that escalated into intra-family conflict and, while the resulting criminal behavior is unquestionably serious, it is also unlikely to recur (*see People v Harris*, 57 NY2d 335 [1982], *cert denied* 460 US 1047 [1983]).[2]

While some disparity in sentencing for comparable crimes is inevitable, the sentence imposed in this case, even as modified by the majority, simply cannot be harmonized with the leniency displayed by this Court in recent rulings. Most notably, the severity of the punishment imposed upon defendant is irreconcilable with the leniency recently displayed by this Court in *People v Felix* (24 AD3d 336 [2005], Tom, J., dissenting). In *Felix*, the defendant, despite an attempt to physically restrain him, made good on a threat to kill his victim by plunging an eight-inch blade into the victim's chest, perforating the heart. Although the cold-blooded attack was deliberate, relentless and unprovoked, this Court reduced a determinate sentence of 25 years to 15 years (*cf. People v Harrison*, 188 AD2d 374 [1992]). The record in *Felix* is remarkable for the absence of any mitigating circumstances and does not warrant an inference that the trial court abused its discretion in imposing the maximum determinate sentence. There is no legal or factual basis to account for a reduction of the defendant's sentence by more than one third. In view of the

---

**1.** According to the sentencing minutes, defendant's 21-year-old daughter had submitted a petition to Family Court seeking custody of the child.

**2.** Although the decision does not disclose the sentence, Jean Harris received 15 years to life for the murder of Dr. Herman Tarnower (Harris, Stranger in Two Worlds, at 195).

substantial difference in the physical harm inflicted on the respective victims—here, only a minor sprain—the lack of any credible evidence of defendant's direct participation in the arson and attempted murder and other disquieting aspects of this case, it presents far more compelling reasons to warrant the exercise of our discretion to reduce the sentence in the interests of justice. In *Felix*, where a man was killed and the defendant concededly administered the fatal wound, the killer will serve only 15 years. In the instant case, where the victim sustained only a sprained ankle and credible proof of defendant's personal involvement in the arson and attempted murder is lacking, she will serve 23 years. The imposition of irreconcilable sentences in the two cases is particularly disturbing because three justices in the *Felix* case also sit on the present case.

In light of the severity of the sentence, the substantial doubt cast by the record upon defendant's direct participation in the arson and attempted murder that followed the kidnapping is troubling. The only such evidence is the testimony given by the complaining witness, which appears false in material respects. Ms. Montecinos told the jury that on December 29, 1999, defendant's accomplices kidnapped her, shortly after she left her Bronx apartment at 7:00 A.M. to go to work. She was taken to an apartment in an abandoned building, where she was held until the following morning, when her captors set fire to the apartment. She testified that defendant was present in the apartment shortly before the fire was set and was overheard discussing the rape and killing of the captive. A fire marshal testified that the fire started at "approximately 10:35, 10:36" on the morning of December 30, 1999. He further stated that Ms. Montecinos told his partner that she had heard defendant and another of her captors talking only one-half hour before the fire began. The complaining witness's consistent statements to investigating officers and at trial hardly support the majority's assumption that they are the product of "victim confusion."

Ms. Montecinos's trial testimony regarding defendant's personal involvement in the arson and attempted murder is simply not credible. It is undisputed that defendant was taken to the 52nd Precinct at about 2:15 A.M. on December 30 and remained there until her arrest at 2:56 P.M. the following afternoon. Thus, defendant had been at the precinct house for some eight hours by the time the fire was set.

Ms. Montecinos also alleged having observed defendant, in her van, in the vicinity of the apartment building in which Ms. Montecinos lived some two weeks after the kidnapping. This claim was immediately recognized as incredible, prompting a

written stipulation in which the People conceded that, at the time of this alleged sighting, defendant was confined in jail. Significantly, the obviously incredible testimony given by Ms. Montecinos is the only evidence to suggest that defendant personally participated in, or had any prior knowledge of, the arson and attempted murder.

When confronted with the information that had been obtained from Ms. Montecinos shortly after her escape from the apartment, defendant gave a signed statement that was read into evidence at trial. She told the investigators that her stepfather had planned the kidnapping two weeks earlier. She admitted to watching as Rodriguez, aided by one Carlos Colon and a black male whom defendant did not know, abducted Ms. Montecinos. After Colon and his unknown accomplice forced the victim into a car, defendant and Rodriguez drove home. Rodriguez told defendant "to stay at home and not to worry because this was his thing." Defendant's statement precipitated the arrest of Rodriguez and Colon, who were taken into custody that same day. Self-serving though it might be, defendant's statement is the only evidence regarding which of the conspirators orchestrated this crime. Emphasizing "the paucity of any evidence that appellant was involved in setting the fire," defendant argues that the sentence imposed by the trial court is excessive. She notes that the minimum 33 years she would have to serve is vastly greater than the 10-year sentence given to the two men who actually set the fire.

For purposes of conviction for all of the acts comprising this crime, it is sufficient that defendant acted in concert with the other kidnappers, as the jury clearly believed.[3] Thus, I point out the lack of credible evidence personally connecting defendant to those acts comprising arson and attempted murder not with any design to dismiss these counts, as the majority inexplicably concludes, but rather to emphasize that this troubling aspect of the case together with other mitigating circumstances should be considered by this Court to justly impose punishment upon defendant for her role in the crimes. There can be no dispute that kidnapping and attempted murder by arson constitute heinous crimes. Of concern in the matter of sentencing is the obvious falsity of Ms. Montecinos's testimony personally implicating defendant in the commission of arson. The record only indicates that the fire was set by Rodriguez and Colon, who were at the scene of the fire while defendant was under the observation of police at the 52nd Precinct. Notably, in their responding brief,

---

**3.** Notes indicate that the jurors twice asked for further instruction on acting in concert, particularly the definition of "in concert."

the People argue only that "her colleagues chose to kill Magali by fire," thus conceding that it was the decision of defendant's accomplices, not her own. While defendant's purpose in locating Julio is unclear, nothing in the record indicates that she was attempting "to get back at her ex-husband," as the majority supposes. For all that is known, defendant may have been seeking to locate Julio for conciliatory purposes.

Even if equal culpability with her co-conspirators is assumed, the sentence imposed on defendant, after modification by the majority of this Court, is 13 years more than the 10-year sentence meted out to her accomplices and more than three times the seven years the trial court initially suggested by way of a negotiated plea.

Accordingly, I would modify the judgment to provide that the sentence for kidnapping be reduced to 15 years to life and that all sentences be served concurrently.