THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTON NOTEY, Appellant.

Second Department, January 21, 1980

### APPEARANCES OF COUNSEL

*James M. La Rossa (Anthony Napolitano* of counsel), for appellant.

*Charles J. Hynes, Deputy Attorney-General (Richard D. Carruthers* of counsel), for respondent.

### OPINION OF THE COURT

*Per Curiam.*

By this appeal the defendant challenges only the sentences of imprisonment imposed on him. He was charged under two indictments totaling 36 counts, with the commission of the crimes of conspiracy in the third degree (2 counts), grand

larceny in the second degree (15 counts), attempted grand larceny in the second degree (1 count), offering a false instrument for filing in the first degree (14 counts), and falsifying business records in the first degree (4 counts). He pleaded guilty to two counts of grand larceny in the second degree in satisfaction of the indictments.

He was sentenced to an indeterminate term of imprisonment with a maximum of four years and a fine of $187,000 on one count, and an indeterminate term of imprisonment with a maximum of four years and a fine of $182,000 on the other count, the terms of imprisonment to run concurrently. The fines—$369,000 in all—are not contested by the defendant. He urges that the sentences of imprisonment are inappropriate and, in view of the state of his health, cruel and unusual.

After consideration of the presentence report of the Probation Department, recommending a conditional discharge and suitable fines, the facts developed at the medical hearing held before sentencing, the sentencing minutes, and the background and present status of the defendant, we modify the sentences by deleting the concurrent terms of imprisonment and place the defendant on probation for five years, with conditions to be imposed by the County Court.

I

The defendant, a physician, owned and operated with his two sons four proprietary nursing homes on Long Island. In addition, he was the controlling partner and director of two proprietary hospitals on Long Island. The indictments were based on the larceny of large sums of money from the State of New York through the Medicaid program and from insurance carriers by submitting false claims for reimbursement of inflated or fictitious expenses supposedly incurred in the operation of the nursing homes and hospitals.

Though the record does not delineate the exact amount of money received by means of the false claims, the prosecution stated at the time of sentence that approximately $3,000,000 had been thus obtained. That, indeed, more than $1,000,000 had been paid to the defendant by the submission of fraudulent claims is evident from the agreement entered into by the defendant, as part of the plea negotiations, whereby the defendant "contracted" to make restitution of $1,250,000 to the State, of which $1,000,000 has already been paid, and the additional $250,000 is to be paid on or before March 19, 1980.

The presentence report, compiled following the defendant's plea of guilty of two counts of the indictments, disclosed that he was suffering from serious and disabling physical ailments which, in the opinion of the Probation Department, made it inadvisable that the defendant be incarcerated; instead, the report recommended that these circumstances, together with the defendant's age, past background, and probable future activities, justified a sentence of appropriate fines and a conditional discharge.

The prosecution requested that an evidentiary hearing be held, at which medical evidence would be produced concerning the defendant's physical condition. Three doctors, all called by the prosecutor, testified at the hearing directed by the court.

Dr. Frank Miller, an urologist, testified that the defendant, due to an operative accident which occurred early in his life, had suffered an urethral stricture, as a result of which an urethral dilation to relieve the accumulation of urine is required periodically about every three weeks to a month at a time. Dr. Miller has been performing the dilation at a hospital, preceded by the injection of spinal antibiotics which help to suppress infection. A cardiologist is also present at the time of the procedure, because the defendant is suffering from a bifurcicular heart block. Dr. Miller was of the opinion that the defendant would eventually die from his urological problem, either incident to a cardiac arrest during the dilation, or due to septicemia. Dr. Miller testified that the dilation procedure is difficult, since the stricture is circuitous and several false passages have developed because of procedures poorly executed in the past. If the instrument used in the dilation should enter a false passage, a perforation of the area between the bladder and the rectum would prove fatal. Dr. Miller stated that hospitalization was necessary for the procedure, and that the defendant would fare badly in prison; Dr. Miller could not treat him in prison.[1]

Dr. Abraham Azulay, a cardiologist, testified that the defendant was a diabetic and had a bifurcicular heart block. All of the defendant's ailments are interrelated.

Dr. Robert Goldstein, an internist, testified that he had been treating the defendant for control of diabetes through the

---

1. Dr. Miller, although engaged in treating the defendant, on cross-examination testified that he was not friendly with the defendant and had no respect for him as a doctor or a man; he was engaged in litigation with the defendant over the management of one of the hospitals, in which the witness had an interest.

administration of insulin. The defendant is now 73 years old and has been a diabetic for about 17 years. As a result of his urethral problem, the defendant has been septic on several occasions, a serious condition particularly because of the diabetes and cardiac involvement from which the defendant suffers. In his opinion, the defendant would not live long in jail, and Dr. Miller is the only physician who can perform the urethral dilation on the defendant.

In sentencing the defendant, the court stated that it was imposing imprisonment because of the nature of the crime, the large size of the sums of money received by the defendant, and to vindicate the law. As to defendant's physical condition, the court said that there were facilities within the penal system for treatment of his ailments and that, in addition, furloughs might be granted by the head of the prison for temporary release of the defendant to be treated elsewhere.

## II

It is our duty in reviewing the defendant's sentence to examine the record in the light of the objectives of the penal system and to make a decision based on the particular facts of the case (ABA Standards Relating to Appellate Review of Sentences, Approved Draft, § 3.1; cf. *People v Gittelson,* 25 AD2d 265, 271-272, affd 18 NY2d 427; *People v Cotter,* 25 AD2d 609, 610). Generally, four principles have been accepted as objectives of criminal punishment: deterrence; rehabilitation; retribution; and isolation (Pugsley, Retributivism: A Just Basis for Criminal Sentences, 7 Hofstra L Rev 379, 381).[2] The primary responsibility for imposing a condign sentence rests on the Trial Judge, and the determination of the kind and limits of punishment made by the Trial Judge should be afforded high respect.

In setting sentence the Trial Judge should be guided not only by the four objectives of punishment, but also by the criterion that a minimum amount of confinement should be imposed "consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the

2. Deterrence includes both individual deterrence and deterrence generally in the community. Rehabilitation is directed toward the reform of the individual. Retribution represents the condemnation of the community for the commission of the offense and the public expectation that the individual shall receive punishment proportionate to his wrong. Isolation is required when the individual is a continuing threat to the community.

defendant" (ABA Standards Relating to Sentencing Alternatives and Procedures, Approved Draft, § 2.2). It is the sensitive balancing of these objectives and criteria in the individual case that makes the process of sentencing the most difficult and delicate decision that a Judge is called upon to perform. In the end, the court must weigh the demands of the community for punishment against the individual posture of the defendant. Each case differs, and no case is necessarily a precedent for the next, except to the extent that disparity in the treatment of individuals similarly situated should be avoided *(People v Golden,* 41 AD2d 242).

Indeed, agreement as to the societal objectives of punishment in the abstract is generally shared; the problem before the courts in obtaining those objectives springs not only from the relative priority to be attached to each objective but also in the temperament, mental and physical condition, past social history, and economic circumstances of the individual defendant. We cannot ignore the personal status of the defendant as the most significant factor in the sentencing process.

The American Law Institute's Model Penal Code has suggested several considerations bearing on the individual aspect of the sentence relating to the harm caused or contemplated by the defendant, the excuse or provocation, if any, for the defendant's conduct, the restitution which may compensate for the harm done, the prior criminal history of the defendant, the likelihood of recurrence of the defendant's conduct, and whether imprisonment would result in excessive hardship to the defendant (Model Penal Code, § 7.01, subd [2]). Doubtless, all of these considerations, even though not so precisely articulated, occupy the mind of the sentencing Judge, and it is in the relative weight to be assigned to these factors that differences in view may emerge.

Moreover, always in the background of the sentencing process are the requirements of the Eighth Amendment. "The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . .,' *Jackson v. Bishop,* 404 F. 2d 571, 579 (CA 8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' *Trop v. Dulles* [356 US 86], *supra,* at 101; see also *Gregg v. Georgia* [428 US 153], *supra,* at 172-173 (joint opinion); *Weems v. United States* [217 US

349], *supra,* at 378, or which 'involve the unnecessary and wanton infliction of pain,' *Gregg v. Georgia, supra,* at 173 (joint opinion); see also *Louisiana ex rel. Francis v Resweber,* 329 U.S. 459, 463 (1947); *Wilkerson v Utah* [99 US 130], *supra,* at 136." *(Estelle v Gamble,* 429 US 97, 102-103; see, also, *Laaman v Helgemoe,* 437 F Supp 269, 323; *Johnson v Harris,* 479 F Supp 333.)

It is with these considerations in mind that we must make our own independent examination and assessment of the record—the "second look at the sentence in light of the societal aims which such sanctions should achieve." (Note, Appellate Review of Primary Sentencing Decisions: A Connecticut Case Study, 69 Yale LJ 1453.)

### III

There is little, if any, conflict in the facts before us. The sentencing Judge laudably directed a hearing to be held concerning the physical condition and medical history of the defendant. The social and economic history of this 73-year-old defendant is clearly set forth in a full and dispassionate presentence report of the Probation Department.

We would be disposed to affirm the sentence imposed, were it not for the physical condition of the defendant. Despite the unblemished background of the defendant, his praiseworthy struggles to improve himself and his community since his emigration to this country as a doctor from Europe many years ago, his charitable contributions, his army service, and the honors awarded to him, the immensity of the fraud, both in money and in impact on the operation of the Medicaid program, would justify the imprisonment as a means of deterrence, not so much for the defendant, in view of his age, but for others who might be tempted, and as a reflection of community condemnation of the conduct of the defendant.

We are persuaded, however, that modification of the sentence is required by the undisputed testimony of the doctors called by the prosecution that imprisonment will in all probability result in the defendant's death. That testimony establishes clearly that the defendant's peculiar and serious urological condition can be treated only in a hospital by Dr. Miller through an operative procedure, and that his condition is complicated by diabetes and cardiac dysfunction tending to make the treatment even more difficult. It must be concluded from the medical testimony that treatment in a prison setting

would be virtually impossible, and if attempted, perilous to the life of the defendant.

In our opinion, and contrary to the view expressed in the dissent, extraordinary circumstances do exist herein which warrant the exercise by this court of its discretion so as to modify the sentence with respect to the terms of imprisonment. While concededly death eventually claims everyone, the innocent as well as the guilty, such truism should never deter this court from setting aside a term of imprisonment where it is manifest that incarceration would hasten the death of a defendant, yet confer little or no benefit upon the general public (cf. *People v Browarnik*, 42 AD2d 953).

The alternative of furloughs from the prison for medical treatment suggested by the sentencing Judge is impractical under the circumstances. We see no benefit to the community in the constant interruption of confinement by the defendant's release and travel over a period of days for treatment every three or four weeks. In short, little is gained by the community and much might be lost to the individual by his incarceration (cf. *People v Browarnik, supra)*, which on this record approaches the imposition of cruel and unusual punishment.

The large fines inflicted on the defendant—$369,000—and the restitution which he has agreed to make —$1,250,000— compensate substantially for the defendant's wrongdoing. His past history and age make it most unlikely that he will ever be criminally involved again.

Accordingly, we modify the sentences by deleting the concurrent terms of imprisonment and imposing probation for five years, the conditions of which shall be fixed on remand by the trial court. Probation will meet the approved criteria for the appropriate punishment of the defendant. (See ABA Standards Relating to Probation, Approved Draft, § 1.3.)

DAMIANI, J. (dissenting). Although I realize that my dissent can have no practical effect in this case, since the Court of Appeals lacks the power to review the appropriateness of a discretionary sentence *(People v Speiser,* 277 NY 342, 344; *People v Gittelson,* 18 NY2d 427), I must dissent and vote to affirm.

It is my conviction that in reviewing the propriety of the sentence imposed in a particular case, it is not the function of appellate Judges to substitute their judgment as to the propriety of the sentence for that of the Judge at Criminal Term,

upon whom the primary sentencing responsibility rests. "[A] determination as to what constitutes an appropriate sentence is a matter resting within the sound discretion of the trial court and the sentence imposed by that court should not be reduced on appeal *unless there was a clear abuse of discretion" (People v Junco,* 43 AD2d 266, 268 [emphasis added], affd 35 NY2d 419, cert den 421 US 951; *People v Dittmar,* 41 AD2d 788). The Appellate Division, Third Department, has suggested that appellate Judges should interfere with the trial court's exercise of discretion only under "most extraordinary circumstances" *(People v Caputo,* 13 AD2d 861; *People v Brown,* 64 AD2d 997).

The question then arises as to what criteria should be used to evaluate whether a Trial Judge has abused his discretion in imposing a particular sentence. The Special Committee on Minimum Standards for the Administration of Criminal Justice of the American Bar Association has indorsed the position taken by the English courts to the effect that appellate Judges should not "tinker" with a sentence and that it should be altered on appeal only where it is excessive to such an extent as to satisfy the appellate court that when it was imposed there was a "failure to apply the right principles" (ABA Standards Relating to Appellate Review of Sentences, Approved Draft, § 3.1, p 49). Stated another way, a sentence should be modified where it is apparent that the trial court overlooked or gave undue weight to one or more of the accepted objectives of criminal sanctions, namely: *"rehabilitation* of the convicted offender into a noncriminal member of society; *isolation* of the offender from society to prevent criminal conduct during the period of confinement; *deterrence* of other members of the community who might have tendencies toward criminal conduct similar to those of the offender (secondary deterrence), and deterrence of the offender himself after release; *community condemnation* or the reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves; and *retribution* or the satisfaction of the community's emotional desire to punish the offender." (Note, Appellate Review of Primary Sentencing Decisions: A Connecticut Case Study, 69 Yale LJ 1453, 1455.)

The relative priority to be accorded to each of these objectives in reaching a decision as to an appropriate sentence is dependent upon the "complex human reality" of each case (see Delaney, An Appraisal of Sentencing Commission Report,

NYLJ, July 30, 1979, p 1, col 2, at p 4, col 2), including the nature of the criminal acts, the life history of the defendant, and the social and historical setting of the acts.

The defendant, Dr. Anton Notey, and his two sons operated four proprietary nursing homes on Long Island and defendant was the controlling partner in two proprietary hospitals in the same area. The defendant was one of the principals in a scheme whereby some 25 firms which supplied goods and services to these institutions submitted fictitious or inflated invoices. These institutions paid the bills and the suppliers made cash "kickbacks" to Notey and his confederates in amounts ranging from 2% to 20% of the bill. During the period from 1970 to 1975, these "kickbacks" amounted to approximately $3,000,000. Many of the inflated bills were covered by Medicaid, Medicare, or private medical insurance. Notey and his accomplices saw to it that claims were made for reimbursement of the funds used to pay the fraudulent or inflated bills, resulting in the theft of some $1,250,000 from the State and insurance companies. It is not denied that this was the largest single fraud of its type perpetrated on Long Island and the second largest such fraud in the history of the State.

I now turn to a consideration of the character and health of the defendant. In his brief, much is made of defendant's charitable endeavors and the fact that he was a "prime mover" in the establishment of several hospitals and nursing homes in Nassau and Suffolk Counties. In my opinion these activities are entitled to little favorable consideration in his behalf. As far as I am aware there is no "Robin Hood" exemption from penal sanctions. The fact that defendant stole from the State and gave to charity should avail him nothing. Similarly, his efforts at founding hospitals and nursing homes are susceptible to the interpretation that defendant was not motivated by the desire to benefit the elderly and infirm but, rather, that his object was to create a wider field for his larcenies.

There is no doubt that defendant is a very sick man. However, the medical testimony indicates that one of the major threats to his health is a diabetes condition which is much more severe than it would otherwise be because he refuses to follow a prescribed diet and is about 35 pounds overweight. At the time of sentence the County Court Judge indicated that he had conducted an investigation and found

that our penal system operates a facility where defendant could be given a special diet and where medical care is readily available. In addition, medical furloughs may be granted so that defendant could receive treatment from Dr. Miller for his urological problems. All the medical witnesses testified that defendant's life expectancy was between six months and two years regardless of whether he was incarcerated. Accordingly, the defendant's contention that imprisonment would be equivalent to a "death sentence" is not completely accurate. Death comes to all men. More specifically, the question is whether incarceration would exacerbate defendant's existing condition and accelerate his death. The County Court satisfied itself that the Department of Correctional Services has facilities to care for inmates with severe medical problems at which the atmosphere is kept at a very relaxed level. Under these circumstances, the County Court's implicit finding that imprisonment would not accelerate defendant's death should not be disturbed.

Finally, there are social and historical factors which are relevant to this case. It is now common knowledge that abuses in the nursing home industry were so pervasive that the Governor found it necessary to appoint a Special Prosecutor to inquire into them. Inflated bills for goods and services rendered to hospitals and nursing homes ultimately have their impact upon the sick and elderly by being passed on in the form of increased costs for patient care. To the extent that these costs are reimbursable by private insurance they cause increased premiums and where reimbursable through Medicaid, the hand of the thief reaches into the pocket of every taxpayer. In short, pernicious schemes like that of defendant and his confederates victimize not only the patients of these institutions but also every person who pays premiums for medical care insurance or taxes.

In light of the facts making up the "complex human reality" of this case as discussed above and in the majority opinion, it is clear that the objectives of *rehabilitation, isolation* and *primary deterrence* (prevention of similar conduct by the offender in the future) would not be served by a sentence of imprisonment in this case. The facts that defendant is 73 years old, that he is likely to die within the next two years because of his physical ailments, and that he has now effectively been divested of the financial control of the institutions in question indicate that he is not likely ever again to become

involved in such a scheme. However, the objectives of *secondary detterrence, community condemnation* and *retribution* would certainly be promoted by a sentence of imprisonment and are ill served by the mere imposition of a fine and a direction that defendant make restitution. Restitution is not punishment because it simply requires the thief to return something to which he was not entitled in the first place. In addition, the imposition of $369,000 in fines on a theft of this magnitude, although certainly a form of punishment, cannot alone serve to deter others from similar conduct. The "kickbacks" involved in this scheme totaled approximately $3,000,000 and restitution and fines reduced the unlawful gain by $1,619,000, leaving $1,381,000 in profits from this criminal venture after apprehension and conviction. It stands to reason that other persons who, like defendant, are in a position to control health care institutions will take the result of this case to mean that one can steal millions without going to jail and only be required to disgorge a fraction of the loot. The County Court was aware of this injustice and imposed a sentence of imprisonment because of it, stating: "Now, it is my purpose to see that the defendant does not profit by what he has done; that others look at the example of the defendant and profit from not repeating his transgressions".

In the ordinary case of a theft by one individual of the property of another the objective of retribution ("the satisfaction of the community's emotional desire to punish the offender" [note, 69 Yale LJ 1453, 1455]), is of little practical significance in imposing sentence, because the harm accrued to an individual and not to the community at large. In this case the facts are quite the opposite. As already indicated above, these larcenies had their impact in the form of higher costs for the institutionalization of the sick and elderly and in increased insurance premiums and higher taxes. The fraud was directed at the public generally and, therefore, they have a legitimate interest in having the defendant punished. Incarceration is a reasonable and appropriate response to that interest.

Finally, the accepted objectives of criminal sanctions include community condemnation, meaning the reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves. The majority opinion does not deal with this concept. Basically, the notion of imposing a meaningful sanction to vindicate societal norms stems from the fact that

good, bad or indifferent, norms or laws are all we have to maintain an ordered society. It is important that the citizenry accept and support the law, not merely out of fear (secondary deterrence) but rather out of a genuine understanding that the law is the bulwark which preserves order. As stated by the American Bar Association's Special Committee on Minimum Standards for the Administration of Criminal Justice: "It is clearly necessary for the law to offer the community the assurance that it is functioning in a manner which will preserve the order which is its highest objective" (ABA Standards Relating to Sentencing Alternatives and Procedures, Approved Draft, § 2.2, p 62). When the public learns that a person who committed a theft of these proportions is to go free without having spent even a day in jail for his crime, contempt and disrespect for the law and the institutions and persons responsible for enforcing it will be the inevitable result. Again, the County Court recognized the application of this salient principle to the instant case when it stated:

"Governments operate by the consent of the governed, and these governments are embodied with a requirement that they provide for the security and health of those who agree to such government, and for that purpose they enact laws designed to provide for a system of justice with the hope that peace and tranquility will reign; that people who have been endowed by their creator with certain unalienable rights will be permitted to enjoy those rights, but there is an exchange, and that exchange requires that individuals, while yielding some of their personal rights, must comply with the system of law enacted so that we might have a rule of law.

*"This must be real. This must be perceived or else what results is gross disrespect for the law, for the system, for the viability of government."* (Emphasis supplied.)

These expressions constituted neither a form of patriotic hyperbole nor a pandering to public opinion. The fact is that public acceptance of the law and its institutions is what holds our society together and a healthy concern for the public's opinion of the sentence to be imposed in a particular case is entirely justified.

Accordingly, in my opinion there is no reason to believe that the Judge at the County Court improperly found, by implication, that defendant's death would not be hastened by incarceration in the State's correctional facility for the sick and elderly, and it does not appear that he overlooked or gave

undue influence to any of the recognized objectives of penal sanctions in imposing a prison term. Consequently, the sentences should be affirmed.

HOPKINS, J. P., TITONE and MANGANO, JJ., concur in *Per Curiam* opinion; DAMIANI, J., dissents and votes to affirm the sentences insofar as appealed from, with an opinion.

Two sentences of the County Court, Suffolk County, both imposed March 19, 1979, modified, as a matter of discretion in the interest of justice, by deleting therefrom the concurrent sentences of imprisonment and substituting therefor concurrent periods of five years' probation. As so modified, sentences affirmed insofar as appealed from and case remitted to the County Court, Suffolk County, for the imposition of appropriate conditions of probation and for further proceedings pursuant to CPL 460.50 (subd 5).