(December 8, 2009)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NORMAN SCHONFELD, Appellant. [890 NYS2d 512]—

The court properly imposed restitution without a hearing. No such hearing is required unless a defendant requests one, or the record lacks sufficient evidence to support a restitution finding (Penal Law § 60.27 [2]). Since defendant did not request a hearing until more than a month after the court calculated the amount of restitution and imposed sentence, the request was clearly untimely (*see People v Seader*, 278 AD2d 26 [2000], *lv denied* 96 NY2d 806 [2001]). Furthermore, the amount of restitution ordered was based upon sufficient evidence of loss, adduced during the trial (*see People v Consalvo*, 89 NY2d 140, 144 [1996]).

Under the particular circumstances presented herein, we find the sentence excessive to the extent indicated. Among the circumstances warranting a reduction in the sentence are the nonviolent nature of defendant's criminal conduct, defendant's age—he was 63 at the time of trial—and the need to ensure that the sentence not be disproportionate to the sentence imposed for similar crimes. In this latter regard, we agree with the dissenter that the "fairness of the criminal justice system requires . . . some measure of equality in the sentences meted out to defendants who commit the same or similar crimes" (*People v Pedraza*, 25 AD3d 394, 397 [2006, Tom, J., dissenting], *lv denied* 7 NY3d 760 [2006]). Concur—Gonzalez, P.J., Friedman and McGuire, JJ.

Tom and Acosta, JJ., dissent in a memorandum by Tom, J., as follows: Defendant's sentence was not unduly harsh and was clearly warranted under the circumstances of this case. The majority's rationale for sentence reduction is devoid of the mention of legitimate mitigating factors that warrant leniency and, by failing to enforce a penalty that serves as a means of deterring others who might be similarly tempted, sends the wrong message to an industry in which trust is essential to the everyday conduct of business.

By Wall Street standards, where losses due to fraudulent schemes are measured in the tens of billions of dollars, this one is not large, involving only some $6 million. But the damages sustained by its victims, among whom is defendant's own son, are extensive and reach beyond mere financial loss to include the erosion of trust that is the foundation which underlies the entire system of commerce in diamonds. In a business where millions of dollars are committed on a handshake and where a dealer's inventory can be carried off in the heel of a shoe, a particularly high premium is placed on personal integrity, and the extent to which defendant profited by his deceit is a poor measure of the damage to the reputation of those dealers whose misplaced trust inadvertently injured and threatened the livelihood of many others. The damage inflicted by defendant is compounded by the inappropriately lax penalty imposed as a result of the majority's reduction of his sentence.

Defendant gained an extensive knowledge of the diamond business, beginning work in the industry in 1956 and, in 1974, forming his own company, Norman Schonfeld Inc. The corporation dissolved in 1980, leaving its creditors with losses totaling some $4 million. As a result, defendant was, by his own admission, "a controversial figure in the diamond industry" and resorted to the use of a pseudonym. Adopting the name Norman Baker "for the public," defendant became a co-owner of Sidco Jewelry, a jewelry manufacturing company located on Fifth Avenue in Manhattan in February 1999. Defendant's son, Ariel, then 27 years old, joined the firm as a salesman. Although Ariel had no experience in the diamond business, defendant taught his son how to sell jewelry. Defendant told Ariel that he was obliged to employ a pseudonym because he was reputed to have been involved with "some sort of diamond scam" in the past.

Defendant's capacity to commit fraud is not simply a matter of reputation. On March 31, 2000, he was convicted of third degree grand larceny in a scheme involving fictitious mortgages, in which he promised a business associate a return of 24% on an investment of $200,000. Defendant received a sentence of five years' probation and was ordered to make restitution in the amount of his victim's investment.

Around this time, defendant told Ariel that he was selling his interest in Sidco to his partner, and Ariel was dismissed as a salesman. Defendant then suggested to his son that they develop a business to give Ariel a "future" in the diamond trade. In June 2000, Anaka Design Ltd. was incorporated, with Ariel listed as its president. Defendant ran the company's operations, this time adopting the pseudonym "Norman Miller," and

instructed Ariel to refer to him as a "family friend" who was helping Ariel "learn the industry," warning that if his involvement in the business and his family relationship ever became known, "no one would ever do business" with Ariel. Defendant paid Ariel a weekly salary in cash and controlled the business records and bank account statements, which Ariel never reviewed. Defendant obtained what Ariel described as "false references" from persons who purported to have had dealings with Anaka Design that Ariel could provide to diamond brokers to obtain stones on consignment or, in the parlance of the trade, "on memo."

Using a list furnished by defendant designating which diamond suppliers to use (and which to avoid using), Ariel began contacting brokers, providing them with the references defendant had obtained and telling them, as defendant had instructed, that Ariel was seeking diamonds Anaka would fabricate into jewelry for a "very high end clientele." By making payment for diamonds within the time provided under the terms of the various consignment memos, Anaka developed a reputation as an ideal client, which enabled it to purchase ever more valuable stones and extend the time for payment.

In February 2001, defendant sent Ariel to a diamond and jewelry trade show in Orlando, Florida. There, he was approached by one Moshe Rabinowitz, who explained that he operated a company called Flextrade International, which dealt in precious metals. Rabinowitz stated that he was interested in purchasing diamonds and gave Ariel his business card. After returning to New York, Ariel gave the card to defendant. Some time later, defendant informed Ariel that Rabinowitz had placed an order for more than $5 million in large diamonds and produced a list of credit references provided by Rabinowitz which, defendant stated, he had checked out.

Using several lists of diamonds defendant had written out, Ariel collected the stones from various suppliers and brought them to defendant at Anaka's office. When the order was complete, defendant told Ariel to deliver the diamonds to Rabinowitz in London. On May 6, 2001, Ariel took a parcel of diamonds from the safe at Anaka's office, secreted them in his underwear and flew to London. He did not declare the diamonds upon arrival. Two days later, Rabinowitz met Ariel at his hotel and took him to an office with the name "Flextrade" on the door. There, Ariel gave him a package of memos, which Rabinowitz compared with the stones. On defendant's instructions, Ariel left the diamonds with Rabinowitz. Two days later, Rabinowitz delivered to Ariel, at his hotel, signed copies of the

memos, a letter of guaranty and nine postdated checks totaling nearly $6.8 million. Upon his return to New York, Ariel was instructed by defendant to deliver the checks to Anaka's attorney, Kenneth Aronson, for expedited collection. According to Aronson, the checks were ultimately rejected by the bank as "forged or fraudulent."

That same month, Anaka, defendant and Ariel were sued by a number of Anaka's suppliers for payment or the return of diamonds delivered on memo. At his deposition, defendant falsely testified that he played no role in obtaining from the suppliers the diamonds that had been sold to Rabinowitz of Flextrade International and that he had no reason to suspect that the checks received from Flextrade were "anything but good."

In late August 2001, Ariel was arrested and charged with grand larceny for using his position with Anaka to steal diamonds. Ariel was originally represented by Aronson, whom defendant provided with the names of persons who might provide bail, including one Maurice Rico, described as a family friend. No bail money was forthcoming, and Ariel remained under detention at Rikers Island.

In the fall of 2001, defendant asked Vincent Sampieri, a childhood friend and fellow diamond dealer, to have certain diamonds graded by the Gemological Institute of America (GIA). Over the next few months, Sampieri obtained a number of GIA certificates, which he returned to defendant, who then paid for them. Sampieri also sold several diamonds obtained from defendant and arranged for approximately a half dozen others to be recut. In March 2002, Sampieri was arrested by a detective investigating Anaka. Police recovered several diamonds that, upon comparison with GIA reports, were determined to be stones that had been provided by Anaka's suppliers and subsequently recut.[1]

In June 2002, a detective followed defendant as he traveled by subway from his apartment in Manhattan to a bank in Woodside Queens. There, defendant deposited $2,000 in cash into Maurice Rico's bank account. Defendant was arrested on July 1, 2002.[2]

Meanwhile, the attorney representing Anaka in the civil liti-

---

1. On December 6, 2002, Sampieri pleaded guilty to criminal possession of stolen property in the third degree and was sentenced to six months' incarceration and five years' probation.

2. At the time of his arrest, defendant was still on probation from his prior conviction of third degree grand larceny in connection with the fraudulent scheme involving fictitious mortgages.

gation was promised a partial payment by Rabinowitz for the diamonds received by Flextrade. The attorney was told that Rabinowitz had sold the diamonds to Asian dealers, who had not yet paid for them. In June 2002, the attorney flew to Israel to meet with Rabinowitz, obtaining his confession of judgment and some identifying documents, including a driver's license.

After returning to New York, the attorney gave a copy of the license to Ariel's attorney. When it was shown to Ariel, he recognized that the person depicted in the license photograph was merely Maurice Rico disguised behind a thick goatee, dark hair and glasses. An August 2001 warrant application indicates that a New York City detective contacted the real Moshe Rabinowitz, an Israeli diamond merchant, and was informed that the latter had never been to Orlando, Florida, was not in London in early May 2001 and had never heard of Ariel or Norman Schonfeld, Anaka Design or Flextrade International.

Police obtained a warrant and conducted a search of Rico's Florida apartment, where they recovered checks of the same type as the checks given to Anaka by Flextrade. On Rico's computer they found letters from Rabinowitz to his lawyer and from Rabinowitz to Ariel, as well as software to print checks for Flextrade, among other entities. In addition, airline records divulged that Rico had made several trips to Tel Aviv, including a two-week stay in March 2002. Finally, account records showed that a $2,000 deposit in Rico's name had been made at a bank in Queens on June 4, 2002 by defendant.[3]

Ariel had been in jail for over a year by the time he was shown the license supposedly belonging to Rabinowitz in late 2002. Shortly thereafter, Ariel began a series of meetings with an Assistant District Attorney, ultimately entering into a cooperation agreement. On January 31, 2003, Ariel pleaded guilty to grand larceny in the first degree in satisfaction of the indictments against him. He turned over two letters received during his pretrial incarceration from defendant that discussed "the hypothetical return of diamonds in return for a plea deal." The letters indicated that defendant had refused the Assistant District Attorney's demand to place the diamonds in escrow before any discussion of a negotiated sentence because those "hypothetical diamonds" were his only "hypothetical ace."

Defendant's jury trial lasted nearly eight weeks with over 50 witnesses appearing for the People. Included among the items the People introduced into evidence were voluminous invoices

---

**3.** On March 16, 2004, Rico pleaded guilty to forgery in the second degree (11 counts) and scheme to defraud (two counts) and was sentenced to 2 to 4 years' incarceration.

and memos detailing the value of each diamond stolen by defendant. Testifying on his own behalf, defendant continued to adhere to his story that he and Anaka had been swindled by Flextrade. On August 10, 2004, following three days of deliberations, the jury convicted defendant of all 40 submitted counts.

Following his conviction, defendant used the "hypothetical diamonds" and a purportedly serious medical condition to delay and manipulate the sentencing process. The People submitted a restitution order indicating that the amount defendant owed 11 diamond suppliers whom he had defrauded was $5,966,389.61. Defendant in a letter to the court dated October 25, 2004 stated that he wished to return "the considerable amounts of stolen merchandise" in his possession and provide the District Attorney's office with memos documenting the money owed to Anaka for stones that had been sold. Defendant offered his assistance with any recovery efforts and requested that sentencing be adjourned from 10 days to two weeks to permit him to deliver the stolen property.

At the adjourned sentencing on October 29, 2004, counsel requested a further two-week adjournment both to give defendant time to turn over the diamonds in his possession and to permit his client to undergo surgery scheduled for November 18, 2004. The People opposed any adjournment as a mere delaying tactic, noting that defendant had made a similar offer to return the diamonds prior to trial in exchange for a negotiated plea.

The court adjudicated defendant a second felony offender and, after reminding defendant that he had been warned sentencing would not be further adjourned, denied the motion and proceeded with sentencing. The People noted that defendant had not only stolen nearly $6 million but had violated the trust of his victims, who "lost their reputation" and suffered "financially, emotionally, [and] physically." Moreover, defendant made his son, Ariel, "the fall guy," resulting in Ariel's conviction of a felony.

Observing that the evidence of defendant's scheme to steal millions of dollars was overwhelming and that there was no question based on his October 25 letter that defendant had perjured himself at trial in an attempt to deceive the court and jury, the court imposed a cumulative sentence of incarceration of from 12½ to 25 years on the charges arising out of the theft of the diamonds, to run consecutively with concurrent terms of 3½ to 7 years imposed for first-degree perjury and violation of probation, for an aggregate sentence of 16 to 32 years. The court further informed the parties that absent a dispute by de-

fendant warranting an immediate hearing as to the amount of restitution, it was prepared to sign the restitution order. However, the court adjourned the execution of sentence so that defendant could have the scheduled surgery.

In December, defendant moved for a further extension of the execution of sentence to late January 2005 because his surgery had been purportedly postponed to an indeterminate date. He further maintained that he had caused to be delivered to the District Attorney's office some $2 million in diamonds in addition to memoranda of accounts receivable in a like amount and, therefore, that the restitution claimed by the District Attorney "must be substantially offset."

The People opposed these requests, noting that restitution had been determined at sentencing. They emphasized that accounts receivable are merely debts, not the goods or cash required to satisfy the restitution order.

On February 8, 2005, defendant moved to reduce his sentence to the minimum of $4^{1}/_{2}$ to 9 years. Defendant argued that the 16-to-32-year aggregate sentence amounted to a "death sentence" because of his "serious medical problems." Defendant also argued that his 16-to-32 year sentence was much more severe than the 2 to 4 years meted out to codefendant Rico. He also pointed to the restitution he had already paid as proof of his rehabilitation.

After hearing argument, the court stated that "[t]he evidence at trial left no question . . . that [defendant] was the prime mover" behind the scheme to defraud the diamond dealers, finding that defendant had received "an appropriate sentence."

On February 22, 2005, prior to executing sentence, the court again heard argument on sentencing. Defendant repeated his request for a reduction in sentence and sought another adjournment of execution of sentence, stating that his surgery was now scheduled for March 17, 2005. Defendant also pointed to his restitution of some $2 million in diamonds as evidence that the victims were "a lot better off" with his help than they would be once he was in prison. The court denied defendant's requests, stating that the restitution order was "based upon the hard evidence in the case," that defendant's sentence was the result of his own actions, and that defendant might receive his surgery faster once in the custody of the State Department of Correctional Services. Accordingly, the court reimposed the sentence it had previously set.

It is axiomatic that this Court is vested with plenary power to modify a sentence "without deference to the sentencing court" (*People v Delgado*, 80 NY2d 780, 783 [1992]). However, that

power should be exercised only where the sentence is "unduly harsh or severe under the circumstances" (*id.*). In determining whether a sentence is appropriate, the factors to be considered are deterrence, rehabilitation, retribution, and isolation (*see People v Notey*, 72 AD2d 279, 282 [1980]). In imposing sentence upon a particular defendant, a court should consider "the harm caused or contemplated by the defendant, the excuse or provocation, if any, for the defendant's conduct, the restitution which may compensate for the harm done, the prior criminal history of the defendant, the likelihood of recurrence of the defendant's conduct, and whether imprisonment would result in excessive hardship to the defendant" (*id.* at 283, citing Model Penal Code § 7.01 [2]).

The record before us does not support the conclusion that defendant is unlikely to engage in future fraudulent conduct. He has a long history as a con artist preying on members of the general public. His earlier diamond business was dissolved in 1980 resulting in $4 million in losses to creditors. As a result, he used an alias to hatch further scams. In 2000, he was convicted of larceny in a scheme involving sale of fictitious mortgages. While he was serving a sentence of five years' probation, including $200,000 in restitution, defendant concocted the instant convoluted plan to steal millions of dollars of diamonds from dealers. This is his second fraud conviction, committed while still on probation following his first such conviction, and the second time his operation of a diamond business has left suppliers with losses in the millions of dollars.

Defendant is a fraud and recidivist with no qualms about casting blame on others, including his own son, to save his own neck. The die was cast when Ariel was used as the front man to set up Anaka. If the scam failed, Ariel would be the fall guy, leaving defendant in the clear. At defendant's arraignment, counsel told the court that defendant's son, Ariel, has "a serious learning disability. He is dyslexic." Counsel nevertheless told the court: "His son formed Anaka, I think, in June of 2000. My client has no equitable interest in Anaka and out of the 11 merchants that my colleague refers to on the other indictment involving his son Mr. Norman Schonfeld did not engage in any transaction with them to obtain diamonds. There were no negotiations. No meetings. He was not at all involved in any of that. As I say, he does not have a proprietary interest in Anaka."

Defendant did nothing to make restitution or otherwise keep his son out of jail, leaving him incarcerated for over a year. Defendant found the fruits of his illegal activities to be more important than the freedom of his own son. As a result of enter-

ing a guilty plea, Ariel has become a convicted felon. Defendant has destroyed his son's reputation and ruined his livelihood, without reservation or apparent regret.

Defendant prolonged his day of reckoning by perjuring himself at civil depositions in 2001 and at his criminal trial in 2004. He indirectly admitted to his perjury in his October 25th letter to the court offering the return of stolen merchandise in an attempt to have his sentence reduced. Defendant's purported remorse and efforts at restitution came only after he was convicted, as part of his last-ditch effort to reduce his sentence and "open the jail door."

In the weeks following defendant's conviction, the scammed merchants sent 13 letters to the court requesting that defendant be given the maximum sentence allowed by law. The victims complained about the impact of defendant's theft on their lives, family and businesses, and also about the need to deter such conduct in an industry in which trust and handshakes remain vital. Even if defendant did not have a history of fraudulent activity, the extent of the fraud and its impact on those who were victimized justify a lengthy period of imprisonment as a means of deterring similar conduct by others. As a result of defendant's fraud, the reputation of the victims and the goodwill of their businesses have been ruined, causing huge losses that may never be recovered. Many of the businesses built their goodwill on a lifetime of laborious work, which defendant's mendacity destroyed in a matter of days. A short sentence will not serve to deter fraud and larceny in an industry vulnerable to this type of crime, where diamonds and other precious stones are commonly transferred by merchants based on a tradition of trust and honesty. The unduly short sentence advocated by the majority sends the wrong message to other prospective criminals by permitting defendant to enjoy the fruits of his crime. Significantly, defendant has failed to account for the roughly $4.5 million worth of diamonds that have not been returned. Rather than protect the diamond industry and deter similar criminal activity, a short sentence will encourage prospective criminals to trade a short sentence for a return of millions of dollars.

The majority's reference to defendant's age is inapposite. While a defendant's health is a relevant factor in assessing the propriety of sentence, age, standing alone, is not (*see e.g. People v Cyr*, 119 AD2d 901 [1986], *lv denied* 68 NY2d 756 [1986]; *People v Notey*, 72 AD2d 279 [1980], *supra*). As this Court has stated, "It is patent that unless incarceration would probably cause defendant's death, he should be made to serve his

sentence" (*People v Browarnik*, 42 AD2d 953 [1973] [heart condition]).

With respect to unsubstantiated protestations of supposedly fragile health, "the mere speculation that due to his advanced age or his prior health problems, the defendant might suffer harm if incarcerated, does not suffice to warrant a modification of the sentence imposed" (*People v Chesnard*, 175 AD2d 254, 255 [1991]). Defendant has, according to the record, been in need of imminently scheduled surgery for the last six or seven years. As this Court stated in *People v Baghai-Kermani* (221 AD2d 219, 220 [1995]), "A modification [of sentence] based on a defendant's deteriorating health must be based on medical proof which convincingly establishes that incarceration would have an extremely deleterious impact." Here, defendant's "poor health" argument is based entirely on unsupported statements by counsel; defendant has not submitted a single medical record or affidavit from a physician to support the notion that imprisonment will have an unduly harmful impact on his health. Defendant has been in custody since his arrest, and in the seven years that have ensued, there is no indication that he has ever undergone surgery (*see Browarnik*, 42 AD2d at 953 ["despite defendant's condition at the time of conviction he has survived for some three years"]; *cf. Notey*, 72 AD2d at 281-282). Nor is there proof of any medical condition that would render the period of incarceration imposed tantamount to a "death sentence," as defendant has repeatedly claimed (*see Baghai-Kermani*, 221 AD2d at 221 [1995] [incarceration not shown to be life-threatening absent evidence of brain tumor's malignancy]). Defendant's only documented pathology is a pathological disregard for the truth, as evinced by his multiple perjury convictions. Moreover, should objective medical testing establish that defendant is afflicted with a potentially deadly condition, he may apply for medical parole under Executive Law § 259-r (*id.*).

Defendant's contention that his offense should be treated leniently because it is a white-collar crime is unsupported by any reference to case law, reflecting its utter lack of merit. In effect, defendant asks this Court to apply a double standard of punishment in favor of those convicted of financial crimes. He also asks this Court to overlook the fact that he was convicted of a previous such crime and was on probation from that conviction at the time of his arrest. Finally, the nonviolent nature of the crime is overshadowed by "the immensity of the fraud" and the devastating impact on defendant's victims, warranting the imposition of a severe sentence as a means of deterring "others who might be tempted, and as a reflection of community

condemnation of the conduct of the defendant" (*Notey*, 72 AD2d at 284 [Medicaid fraud]).

While defendant complains that his coconspirator, Rico, received a disproportionately low sentence for his part in the fraudulent enterprise, defendant concedes that "he certainly deserved a greater sentence than Rico." Rico, likewise a second felony offender, was convicted of a less serious offense. He pleaded guilty to the top count in the indictment against him, forgery in the second degree, a class D felony (Penal Law § 170.10), while defendant was convicted of, inter alia, grand larceny in the first degree, a class B felony (Penal Law § 155.42). In addition, Rico's role in the scheme was relatively minor, being limited to the forging of checks and, at defendant's instance, making trips to Israel to impersonate Moshe Rabinowitz.

Defendant, on the other hand, with his extensive experience in the diamond business, was the mastermind and motive force that guided the entire scheme to defraud Anaka's suppliers. Not only is defendant a second felony offender due to his conviction of third degree grand larceny in connection with the sale of fictitious mortgages, he previously operated a diamond brokerage business that caused some $4 million in losses to its creditors, with the result that defendant, by his own admission, "was a controversial figure in the diamond industry." It was defendant who formed Anaka, using his son to obtain diamonds on consignment and to spirit over $5 million in stones to London, where they simply disappeared. In view of defendant's pivotal role in the crime, it cannot be said that the sentence imposed by Supreme Court is "unduly harsh or severe" (*Delgado*, 80 NY2d at 783; *cf. People v Pedraza*, 25 AD3d 394, 398 [2006, Tom, J., dissenting], *lv denied* 7 NY3d 760 [2006] [reduced sentence of 23 years to life imposed despite "a lack of credible evidence to personally connect defendant to the acts comprising arson and attempted murder and the victim sustained no significant physical harm"]).

Review of the record thus indicates that, under all the circumstances, the sentence imposed by Justice Carruthers was warranted (*see People v Barzge*, 244 AD2d 213, 214 [1997], *lv denied* 91 NY2d 889 [1998]). The present scheme to defraud resulted in some 40 counts being submitted to the jury, on all of which defendant was found guilty, including grand larceny in the first, second and third degrees, forgery, criminal possession of stolen property and perjury. The fraud was committed against separate individuals and entities. Indeed, the sentence imposed was "relatively lenient" (*id.*) inasmuch as Justice Carruthers was not obligated to have the bulk of the prison terms run

concurrently, as he did, instead of consecutively (Penal Law § 70.25 [1]).

Defendant has shown no remorse for the fraud he committed or the injury to his victims including his own son. When the fraudulent scheme began to unravel in 2001, defendant left his son holding the bag. He then perjured himself at trial in an attempt to avoid conviction. It was only after being convicted that he offered to return a portion of the stolen merchandise in an attempt to barter a shorter sentence but still has not accounted for an additional $4.5 million in stolen diamonds. After sentencing, defendant continued to deceive the court to delay execution of the sentence advancing unsubstantiated medical ailments to bargain for a lesser sentence.

Even with the foregoing background, the majority sees fit to reduce defendant's aggregated prison term of 16 to 32 years to 8½ to 17 years, making defendant soon eligible for parole.

At defendant's arraignment, the Assistant District Attorney told the court that defendant "is well known in the diamond community as a con artist. In fact, that is, not only in the diamond community, but in the community at large. He is a con artist. That is what he does for a living. And I assume that he will attempt to con the Court." The record demonstrates that these words were prescient. The proceedings in this matter establish that defendant has engaged in confidence schemes, successfully duping victims both within and outside the diamond community. The majority's disposition of this appeal demonstrates that defendant has been no less successful in his attempt to deceive this Court.