Judgment, Supreme Court, New York County (Edward J. McLaughlin, J.), rendered February 24, 2009, convicting defendant, after a jury trial, of criminal possession of a weapon in the second degree and 26 counts of criminal possession of a weapon in the third degree, and sentencing him, as a second felony offender, to an aggregate term of I8V2 to 22 years, modified, as a matter of discretion in the interest of justice, to the extent of directing that all sentences be served concurrently, resulting in a new aggregate term of 15 years, and otherwise affirmed.
Defendant was convicted of possessing a loaded Bushmaster *591 AR-15 assault rifle, a weapon so deadly that the .223 caliber bullets it is capable of firing would penetrate the vests worn by New York City police officers. He was also convicted of possessing 22 high-capacity magazines, each of which held 30 rounds of such ammunition. In addition to the rifle and the ammunition feeders for it, defendant was convicted of possessing a Glock 9 millimeter automatic pistol and a knife.
The evidence at trial established that defendant kept the AR-15 assault rifle in a black bag and that when he went out of his apartment, he often brought the rifle with him, keeping it in the black bag and placing it on the floor of his car, between the front and back seats. Defendant also usually carried the Glock pistol, which he concealed in his waistband, along with two extra magazines. One of defendant’s friends testified that he once saw defendant with the pistol in Penn Station. Defendant also carried a knife in his pocket.
The main witness at trial was defendant’s girlfriend. She testified that, on one occasion, she found defendant in the living room of the apartment they lived in holding her sister’s dog, which was not moving. When she said she wanted to take the dog to a veterinarian, defendant pointed the loaded AR-15 rifle at her, and threatened to shoot her and the dog. After a struggle over the gun, defendant calmed down. When the girlfriend went to call a veterinarian, defendant opened the freezer, removed the frozen body of the girlfriend’s own dog, slammed it on the counter, and told her to take it to the veterinarian for an autopsy. When the girlfriend tried to leave the apartment, defendant pointed the rifle at her and said that he would shoot her if she left.
On another occasion, defendant met his girlfriend, who was pregnant, at 34th Street and Lexington Avenue in Manhattan. When the girlfriend told defendant that she was going to look at an apartment because she did not want her child to live in a home with weapons, defendant yelled at her. She walked away, and defendant positioned himself in front of her, screaming and insisting that she give him her set of keys to his apartment. Furious, defendant said he was going to “shoot” or “kill” her, and that he did not care that they were in a public place. When the girlfriend refused to give him the keys, defendant put his hand on his hip, as if he were about to draw a gun. The girlfriend knew he had a gun there because she had felt it earlier when they hugged. She then gave defendant the keys, and stayed elsewhere that night.
The girlfriend further testified that she had an abortion because defendant refused to get rid of the guns. On the day of *592 the procedure, she told defendant she was not coming back to live with him, and he told her that she would “pay for that.” They met for dinner that evening in Manhattan, and after dinner, the girlfriend went back to defendant’s apartment, and they reconciled. But when she told defendant about the abortion, he grabbed a rifle and threatened to kill her. She begged him to put the gun down, and he eventually calmed down. Shortly thereafter, the couple spent Thanksgiving weekend in Vermont with the girlfriend’s sister and her sister’s boyfriend. Defendant brought the Glock and the assault rifle to Vermont.
Later that fall, defendant and his girlfriend attended couples counseling. At one of the sessions, defendant arrived carrying a handgun in his waistband and the rifle in a tennis bag. When the subject of defendant’s threats to kill his girlfriend arose, defendant reached into his coat, pulled out the handgun, and placed it within his grasp. The therapist saw what looked like an ammunition clip on the table between the couch and the chair. At trial, the therapist testified that the Glock recovered from defendant’s apartment “resembled” the black handgun that defendant displayed at the therapy session.
A few weeks later, defendant’s girlfriend’s sister came to stay with them after she had an argument with her boyfriend. At around 3:00 a.m., defendant drove the sister to her boyfriend’s apartment so that she could retrieve her belongings. Defendant brought the Glock pistol and the rifle. Defendant and the boyfriend argued outside the building. The boyfriend’s brother was also present. The boyfriend frisked defendant for weapons and would not allow him to come upstairs. When defendant told his girlfriend that he was going to pull out his gun and shoot the sister’s boyfriend, she intervened and stood between them. Defendant got in his car and said he was leaving alone. When his girlfriend and her sister came back from collecting the sister’s belongings, defendant returned and was holding the Glock. The rifle was next to his car. Defendant picked up the rifle and gave it to his girlfriend. She put the rifle down and asked defendant to get rid of it. The sister also asked defendant to put the Glock away, and defendant told her to “shut up.” During the drive back, defendant mentioned he had almost shot the boyfriend’s brother, and when they got home, defendant started loading his weapons, concerned that the boyfriend would call the police. Subsequently, defendant sent one of his friends an instant message stating that he had almost shot the boyfriend, and that he carried his assault rifle “locked and loaded.” Defendant added that his girlfriend “saved” him by throwing herself in front of him. Otherwise, he stated, they *593 “would have found out what a frangible does to a human body.”* The boyfriend later denied that defendant had threatened to shoot him.
On New Year’s Eve, defendant’s girlfriend returned to their apartment after a fight. She heard a noise that sounded like a weapon being fired, and a few minutes later, defendant entered the apartment carrying the assault rifle. Defendant asked if she had heard the noise made by the rifle being fired. When she responded that it was “really loud,” defendant said that he would never shoot it downstairs again. The following day, defendant told his girlfriend that he was going to shoot her sister for bringing her boyfriend into their lives.
The day after New Year’s Day, defendant’s girlfriend met with the Assistant District Attorney who was handling an unrelated case in which she was a cooperating witness. She later met with several detectives and told them that defendant had an AR-15 assault rifle and a handgun, and that he frequently carried the guns on his person or in his car. She added that defendant pointed the handgun at her frequently, had pointed a gun at her head on one occasion and threatened to kill her, and had threatened to kill her sister and her sister’s boyfriend.
The detectives formulated a plan to apprehend defendant. At their suggestion, the girlfriend called defendant and said that she was sick and receiving treatment at the New York Downtown Hospital. She asked defendant to pick her up. She went to the location with detectives and a team of police officers. Defendant arrived in a car and when he exited it he was apprehended by the police. One of the detectives entered the passenger side of defendant’s car after obtaining the keys, and saw, in plain view, what appeared to be a rifle and scope, sticking out of a black bag located between the front and back seats. He also saw two large backpacks, one of which appeared to contain magazines with ammunition. Another detective saw a backpack in the back seat. At the precinct, the police searched defendant and recovered from his pocket three rounds of .22 caliber ammunition and a switchblade knife. That night, warrants were obtained to search defendant’s vehicle and his apartment. Officers searched defendant’s apartment and recovered a loaded, operable Glock pistol with a high-capacity magazine, as well as gun parts, including parts for an AR-15 rifle, a .22 caliber conversion kit for the Glock, an extra gun barrel, an “extremely large amount of ammunition,” magazine holders, and knife cases. In addition, they found targets with bull’s-eyes, a bulletproof *594 vest, and two bullet-resistant Kevlar helmets. In defendant’s vehicle detectives found an operable Bushmaster AR-15 assault rifle in a black bag on the floor behind the passenger seat with a fully-loaded .223 caliber magazine, and a round in the chamber. They also found two green backpacks in the back seat containing, among other things, 26 fully-loaded 30-round magazines with .223 caliber ammunition (780 rounds total), a .22 caliber conversion kit, another bulletproof vest, two .45 caliber magazines, one .22 caliber magazine, fifty-seven .45 caliber rounds, and seven .22 caliber rounds.
On the conviction for criminal possession of a weapon in the second degree, defendant was sentenced, as a second felony offender, to a determinate term of 15 years for possession of the loaded assault rifle. On the conviction for criminal possession of a weapon in the third degree in connection with the Glock pistol, defendant was sentenced to two indeterminate sentences of 3x/2 to 7 years, concurrent to each other but consecutive to the 15 year term. The 22 counts of the same crime that stemmed from defendant’s possession of large capacity ammunition feeding devices resulted in 22 concurrent terms of seven years, and the count relating to the knife brought defendant an indeterminate term of 2 to 4 years, also to run concurrently. Pursuant to Penal Law 70.30 (1) (e) (ii), the entire aggregate sentence of I8V2 to 22 years imprisonment was reduced to a determinate sentence of 20 years.
The court properly denied defendant’s motion to suppress evidence recovered from his car pursuant to a search warrant. There is no basis for disturbing the court’s credibility determinations, which are supported by the record (see People v Prochilo, 41 NY2d 759, 761 [1977]). Further, the court properly exercised its discretion in precluding cross-examination that went beyond the scope of the hearing.
The court also properly denied defendant’s motion to suppress evidence recovered from his computers pursuant to another search warrant. The warrant application established probable cause to believe that defendant was engaged in a pattern of firearms transactions, and supported an inference that evidence of such transactions could be found on his computers (see generally People v Gramson, 50 AD3d 294, 295 [2008], lv denied 11 NY3d 832 [2008]). In any event, the computer evidence introduced at trial added little or nothing to the People’s case, and any error in receiving that evidence was harmless (see People v Crimmins, 36 NY2d 230 [1975]).
Defendant challenges the legal sufficiency of the evidence supporting his convictions of possessing a pistol during two *595 incidents that took place before the police recovered the pistol from defendant’s apartment. However, the totality of the circumstantial evidence warranted the conclusion that the pistol, which was determined to be operable when recovered after defendant’s arrest, was also operable when defendant displayed it on the occasions in question. As in People v Temple, “[u]nder the circumstances of this case it defies logic to conclude that the gun was inoperable,” (165 AD2d 748, 749 [1990], lv denied 76 NY2d 944 [1990]), or that operability on those occasions was not established beyond a reasonable doubt.
The witnesses were unable to specify the dates on which these two incidents occurred. Accordingly, the corresponding counts of the indictment set forth approximate time frames. Under the circumstances, the People were unable to allege more specific time periods, and defendant received reasonable notice (see People v Morris, 61 NY2d 290, 296 [1984]; People v Latouche, 303 AD2d 246 [2003], lv denied 100 NY2d 595 [2003]).
Defendant also challenges the legal sufficiency of the evidence supporting his convictions relating to possession of large capacity ammunition feeding devices (Penal Law § 265.02 [8]). However, the evidence established that the 30-round magazines met the statutory definition (Penal Law § 265.00 [23]).
The court properly received evidence of defendant’s abusive conduct. One of the main issues at trial was the credibility of defendant’s former girlfriend, particularly with regard to certain charges of which defendant was ultimately acquitted. The challenged evidence completed the narrative and provided necessary background information to place the ex-girlfriend’s testimony in a believable context (see People v Leeson, 12 NY3d 823, 827 [2009]; People v Dorm, 12 NY3d 16, 19 [2009]; People v Steinberg, 170 AD2d 50, 72-74 [1991], affd 79 NY2d 673 [1992]). The evidence was also relevant to defendant’s intent to use one of the weapons unlawfully against another person, which was an element of one of the charges.
The probative value of the challenged evidence outweighed any prejudicial effect. While some of the evidence involved cruelty to animals, it was not so inflammatory as to deprive defendant of a fair trial. The court minimized any prejudice by means of careful limiting instructions, and it took sufficient curative action regarding inadmissible testimony that was inadvertently elicited. In any event, given the overwhelming evidence against defendant, there is no significant probability that the admission of the challenged evidence affected the verdict (see People v Gillyard, 13 NY3d 351, 356 [2009]).
“It is our duty in reviewing the defendant’s sentence to ex *596 amine the record in the light of the objectives of the penal system and to make a decision based on the particular facts of the case. Generally, four principles have been accepted as objectives of criminal punishment: deterrence; rehabilitation; retribution; and isolation. The primary responsibility for imposing a condign sentence rests on the [tjrial [jjudge, and the determination of the kind and limits of punishment made by the [t]rial (jjudge should be afforded high respect” (People v Notey, 72 AD2d 279, 282 [1980] [internal citations omitted]).
In light of these principles, we find only that it was excessive to run the indeterminate sentences consecutive to the determinate sentence of 15 years. However, the dissent’s argument for a further reduction is entirely unfounded and rings hollow. First, while defendant may not have engaged in any behavior towards humans which would fit the dictionary definition of “violent,” many of his actions involving the weapons he possessed were unquestionably sinister and menacing, such as pointing them at people and otherwise displaying them in his encounters with people he perceived as hostile. It is mystifying that the dissent does not consider defendant’s numerous statements to his girlfriend that he was going to kill her as “threatening.” Further, defendant’s brazen and cavalier decisions to carry a Glock pistol in as public a place as Penn Station and to brandish that same weapon in a therapy session demonstrate that this is not a garden variety weapons possession case.
In any event, the dissent’s position is inconsistent with the Penal Law. Taken to its logical conclusion, the dissent’s argument would preclude a court from ever sentencing a defendant convicted of weapons possession to the maximum prison term, in the absence of aggravating factors such as the actual use of a weapon to harm somebody. However, this plainly contravenes the intent of the Legislature. Had the Legislature meant to limit the sentence for strict possession to the prison terms preferred by the dissent, it presumably would have so provided in the statute.
Further, contrary to the dissent’s view, nothing in our precedent mandates that the maximum sentence in a weapons possession case may not be imposed where no one was harmed. The sentences handed down in each of the cases cited by the dissent were based on the unique facts presented by each case. Further, the dissent’s analysis ignores the different goals of sentencing. For example, one of the four widely recognized goals of sentencing is isolation, which “is required when the individual is a continuing threat to the community” (People v Notey, 72 AD2d at 282 n 2). The cases cited by the dissent do not sug *597 gest that the defendant in those cases represented a continuing threat, so the sentencing courts in those cases may have seen no great need to “isolate” the defendant, notwithstanding the harm caused to the victims in those cases. Here, defendant displayed extreme anti-social behavior and recklessness, which calls for isolation from the community, notwithstanding that he was not found to have intended to use the weapons. Indeed, the probation department concluded in its presentence report that defendant “appears to be a threat to the community,” and that his prognosis for “future adjustment towards society appears to be poor.”
By adopting trial counsel’s statement that defendant was merely a gun hobbyist, the dissent virtually ignores all of the evidence in the case. To this defendant guns are clearly more than a pastime. They are a means of intimidation, menace and exerting power. His use of them, repeatedly, in such a manner, fully justifies the sentence imposed herein. Indeed, if this strict possession case does not call for the maximum sentence, one is hard pressed to imagine one that would.
Defendant’s remaining contentions are unpreserved or abandoned, and we decline to review them in the interest of justice. As an alternative holding, we find no basis for reversal. Concur — Mazzarelli, J.P., Friedman, Renwick and Freedman, JJ. Catterson, J., dissents in part in a memorandum as follows:

 Frangible bullets are designed to break up into smaller pieces upon contact with harder objects or surfaces.